922 F.2d 1476
 59 USLW 2440
 Robert Ross HOCKER and Waylon Cummins, Plaintiffs,
v.
NEW HAMPSHIRE INSURANCE COMPANY, a New Hampshire
Corporation, Defendant/Cross-Claim Defendant/Appellee,
v.
FIRST STATE INSURANCE COMPANY, a Massachusetts Corporation,
Defendant/Cross-Claim Plaintiff/Appellant,
American International Adjustment
Company, a Delaware
Corporation, Defendant.
 No. 89-8059.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 7, 1991.
 
 Dirk W. de Roos of Kutak Rock & Campbell, Denver, Colo. (Tana K. Simard of Kutak Rock & Campbell, G.G. Greenlee and James R. Bell of Murane & Bostwick, Casper, Wyo., with him on the briefs), for defendant/cross-claim plaintiff/appellant.
 Gregory R. Piche of Holland & Hart, Denver, Colo. (Harry F. Buck of Buck & Lewis, Cheyenne, Wyo., with him on the brief), for defendant/cross-claim defendant/appellee.
 Before McKAY and ANDERSON, Circuit Judges, and BROWN, District Judge.[1]
 McKAY, Circuit Judge.
 
 
 1
 This diversity action is an appeal by defendant First State Insurance Company, the excess insurance carrier for plaintiffs Robert Hocker and Wayne Cummins, from an order dismissing First State's crossclaim against defendant New Hampshire Insurance Company, plaintiffs' primary insurer. First State appeals the district court's interpretation of its contractual obligation to drop down and defend the plaintiffs, the court's ruling that First State's "unclean hands" bars its equitable subrogation crossclaim, and the court's refusal to recognize a direct cause of action against New Hampshire independent of equitable principles.
 
 I.
 
 2
 Plaintiffs Robert Hocker and Wayne Cummins were employees of the John E. Burns Drilling Company. Mr. Hocker worked as a tool pusher and Mr. Cummins worked as a drilling superintendent on a drilling rig in Wyoming in February 1980. On February 27, 1980, Larry Julian, a roughneck employed with Burns Drilling, was injured when a chain on the drilling rig broke and struck him in the face.
 
 
 3
 At the time of the accident, Burns Drilling and its employees were insured by New Hampshire Insurance Company under a general liability policy that provided primary coverage in the amount of $500,000.00. Burns Drilling and its employees were also insured under an umbrella liability policy issued by First State Insurance Company for up to $10,000,000.00.
 
 
 4
 Four years after the accident Mr. Julian filed Julian v. Energy Reserves Group, Inc., Civil No. 56620, in Wyoming State District Court. The complaint alleged that defendants Robert Hocker, Wayne Cummins and John Burns, president and general manager of Burns Drilling, had caused his injuries through their negligence.
 
 
 5
 Burns Drilling had been discharged in bankruptcy at the time Mr. Julian filed suit. John Burns forwarded the complaint to John Burk, the attorney representing Burns Drilling in bankruptcy proceedings, and assured Messrs. Hocker and Cummins that a defense would be provided for them. Unfortunately, as the ensuing events unfolded, no defense was ever provided.
 
 
 6
 Through a circuitous route, Mr. Burk tendered the defense of the Julian suit to New Hampshire and First State. He sent the complaint to the Ralph Hamm Insurance Agency which sold the New Hampshire policy to Burns Drilling. The Hamm Agency, in turn, gave the documents to New Hampshire's claims adjuster, American International Adjustment Company. The Hamm Agency also sent the documents to the Wetzel Company, Inc., the surplus lines broker which sold the First State policy to Burns Drilling. Wetzel forwarded the materials to First State and informed them that New Hampshire was the primary carrier.
 
 
 7
 On March 20, 1984, First State opened a file for the Julian claim. T.W. Ross, the First State employee handling the file, acknowledged to Wetzel receipt of the complaint but did not contact New Hampshire to inform them that First State was the excess insurer. In May 1984, Mr. Ross determined that the excess policy was in effect and set up a $5000.00 reserve on the file. However, on May 25, 1984, he closed the Julian claim file. He did not notify the state court defendants, Messrs. Hocker and Cummins, that First State was not providing a defense as the excess carrier.
 
 
 8
 New Hampshire, acting through its claims adjuster, American International, opened a claim file for the Julian case on March 30, 1984. American International's branch manager, Theodore C. Freuh, mailed two letters to John Burk (attorney for the bankrupt drilling company) informing him that neither Mr. Hocker nor Mr. Cummins were covered under the New Hampshire policy and that New Hampshire would not provide either with a defense. Mr. Burk did not believe he represented Messrs. Hocker and Cummins in the Julian suit. Consequently, he did not inform them that they were not being defended by New Hampshire. Nor did Mr. Freuh contact Messrs. Hocker or Cummins directly or First State to inform them that New Hampshire would not supply a defense. Although New Hampshire retained counsel to represent John Burns personally, neither First State nor New Hampshire arranged for the co-employees' defense.
 
 
 9
 Larry Julian made a motion for entry of default against Messrs. Hocker and Cummins on August 18, 1986. On May 29, 1987, while the entry of default judgment was still pending, Robert Hocker and Wayne Cummins filed the present lawsuit, Hocker v. New Hampshire Insurance Co., Civil No. 3872, in Wyoming State District Court. The complaint alleged that New Hampshire and First State had breached their contracts of insurance by refusing to defend and indemnify them. Plaintiffs contended that New Hampshire and First State had breached the covenants of good faith implied in their insurance contracts by failing to properly investigate, interpret and evaluate Larry Julian's claim and the New Hampshire policy. They also alleged that both carriers breached their implied covenants of good faith by failing to notify them of the decision not to defend them in the Julian lawsuit. The suit was removed to the United States District Court for the District of Wyoming on June 25, 1987.
 
 
 10
 First State filed a crossclaim against New Hampshire in the present lawsuit on August 21, 1987. First State contended that its right to defend was prejudiced by New Hampshire's failure to notify First State of its decision not to defend Messrs. Hocker and Cummins in the Julian suit. The crossclaim sought indemnification alleging that New Hampshire's failure to notify First State constituted a breach of the implied covenant of good faith and fair dealing owed to First State. It further alleged that New Hampshire's actions constituted a failure to exercise reasonable care to protect the relationship existing between the two insurers. New Hampshire also asserted a crossclaim against First State for implied indemnity.
 
 
 11
 On October 27, 1987, Larry Julian moved to dismiss John Burns as a defendant in the Julian case, and on November 3, 1987, a default judgment was entered against Messrs. Hocker and Cummins in the amount of $2,865,568.13 with interest.
 
 
 12
 The district court entered an order granting partial summary judgment to the plaintiffs in the present lawsuit on April 1, 1988, finding that New Hampshire and First State had a duty to provide a defense in the Julian action. The court held that "New Hampshire's duty to defend was triggered by the potential for coverage for plaintiffs under the policy issued to Burns Drilling for the claims asserted in the Julian complaint." Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 18 (D.Wyo. Apr. 1, 1988) (Order Granting Plaintiffs' Motion for Partial Summary Judgment and Denying Defendants' Motions for Summary Judgment). The district court also held that First State's "duty to defend and investigate was triggered when New Hampshire refused to defend, inasmuch as the Julian complaint potentially stated a claim with [sic] the coverage of the First State policy." Id. at 25 (emphasis in original).
 
 
 13
 The jury trial commenced on April 4, 1988. New Hampshire and First State moved for a directed verdict on April 8, 1988. The district court granted these motions in part as to plaintiffs' claims for negligence and punitive damages. However, the district court adhered to its earlier decision that New Hampshire and First State had each breached their contractual duty to defend.
 
 
 14
 The case was submitted to the jury on April 13, 1988, but the crossclaims of New Hampshire and First State were reserved for the district court's determination. The jury returned a verdict against the two insurers. It assessed $500,000.00 in damages against New Hampshire for breach of its contractual duty to defend Messrs. Hocker and Cummins. The jury assessed another $875,000.00 for breach of its implied covenant of good faith and fair dealing. First State was assessed damages in the amount of $2,580,485.00 for breach of its contractual duty to defend under the excess liability policy and $875,000.00 for breach of the covenant of good faith and fair dealing.
 
 
 15
 These judgments were compromised and settled after trial. Robert Hocker, Wayne Cummins and First State agreed to dismissal with prejudice of all claims for relief with no admission of liability.
 
 
 16
 The district court denied the crossclaims of both insurers. It found that First State lacked the "clean hands" necessary to assert its equitable subrogation claim because First State had breached its implied covenant of good faith and fair dealing. "First State had an independent duty to investigate the Julian claim, to defend in the event the primary carrier declined, and to undertake settlement negotiations on behalf of Hocker and Cummins. It failed to do so and cannot now be subrogated to the rights of its insureds." Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 27 (D.Wyo. Aug. 11, 1988) (Memorandum and Order).
 
 
 17
 The district court also refused to recognize First State's direct cause of action against New Hampshire. The court concluded that First State had failed to identify a distinct non-equitable theory. Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 4 (D.Wyo. June 27, 1989) (Order).
 
 
 18
 First State now appeals the district court's dismissal of its crossclaim against New Hampshire. The appeal presents two separate issues. First, we must interpret the First State umbrella liability policy to decide under what circumstances First State was obligated to provide a defense for Messrs. Hocker and Cummins and whether First State breached that duty. This determination will form the basis for our review of the court's ruling that First State's crossclaim against New Hampshire is barred due to "unclean hands." Second, we must decide whether under Wyoming law First State may assert a direct cause of action against New Hampshire despite the lack of contractual privity between the two insurers.
 
 II.
 
 19
 We turn first to First State's contention that it was not obligated to "drop down" and defend Messrs. Hocker and Cummins. In order to evaluate whether First State's duty to defend was triggered, we must interpret the umbrella liability policy. The issue of interpreting insurance policy language presents a question of law subject to de novo review by this court. Healy Tibbitts Construction Co. v. Insurance Co. of N. Am., 679 F.2d 803 (9th Cir.1982).
 
 
 20
 Under Wyoming law, general principles of contract construction are applicable to the interpretation of insurance policies. Commercial Union Ins. Co. v. Stamper, 732 P.2d 534, 538-39 (Wyo.1987). We begin by examining the policy language itself to give effect to the intention of the parties. Id. at 539. The intention of the parties is established from the words of the contract as a whole and by reading each provision in light of all the other provisions. Bethurem v. Hammett, 736 P.2d 1128, 1136 (Wyo.1987).
 
 
 21
 The one exception to construing insurance policies like other contracts is the requirement that ambiguous language is to be liberally construed in favor of the insured. State Farm Fire and Casualty Co. v. Paulson, 756 P.2d 764, 765 (Wyo.1988). An ambiguous contract "is an agreement which is obscure in its meaning, because of indefiniteness of expression or because a double meaning is present." Bulis v. Wells, 565 P.2d 487, 490 (Wyo.1977). However, where the terms of the policy are unambiguous, a court may not rewrite the parties' contract nor limit the effect of the contract as written. Amoco Prod. Co. v. Stauffer Chem. Co. of Wyo., 612 P.2d 463, 465 (Wyo.1980).
 
 A.
 
 22
 With these interpretative principles in mind, we turn to the policy language at issue. Several of First State's arguments are based on its contention that the district court misconstrued Insuring Agreement IV.A. That provision states:
 
 IV. DEFENSE SETTLEMENT
 
 23
 A. With respect to any OCCURRENCE not covered, as warranted, by the underlying policies listed in Schedule A hereof, whether collectible or not, or not covered by any other underlying insurance collectible by the INSURED, but covered by the terms and conditions of this policy, except for the RETAINED LIMIT stated in Item 3 I B of the Declarations, the Company shall:
 
 
 24
 1. defend any suit against the insured alleging PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY or DAMAGE and seeking damages therefore, even if such suit is groundless, false or fraudulent; but the COMPANY may make such investigation, negotiation or settlement of any claim or suit as it deems expedient.
 
 
 25
 First State argues that its obligation to defend under Insuring Agreement IV.A. is triggered only by an occurrence for which it provides enforceable coverage but the underlying New Hampshire policy does not. In other words, First State contends that it must drop down from its role as excess carrier and defend its insureds as the primary insurer for those occurrences for which it is providing the only insurance coverage. These occurrences, under First State's interpretation, are limited to claims asserted against Burns Drilling and certain classes of insureds such as real estate agents, stockholders or partners.[2] The district court held that the underlying New Hampshire policy did provide coverage and required New Hampshire to defend Messrs. Hocker and Cummins against the Julian claim. Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 17-18 (D.Wyo. Aug. 11, 1988) (Memorandum and Order). Accordingly, First State asserts that it was not obligated to drop down and defend under the terms of its policy.
 
 
 26
 First State points to other policy provisions to support its construction. It acknowledges that it was obligated to provide a defense for the plaintiffs in Condition I of the policy and argues that, by implication, it did not agree to drop down in other circumstances. That obligation is triggered only after New Hampshire has paid its $500,000.00 policy limit, not when New Hampshire wrongfully declines to defend. Condition I states:
 
 
 27
 If underlying insurance applicable in any one OCCURRENCE is exhausted by payment of judgment or settlement on behalf of the INSURED, the COMPANY shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the INSURED resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another insurer.
 
 
 28
 Because New Hampshire had not actually paid its $500,000.00 policy limit in defending Messrs. Hocker and Cummins in the Julian suit, First State contends that its duty to defend was not triggered.
 
 
 29
 First State also argues that an additional provision in its policy demonstrates that they did not breach their duty to defend. Insuring Agreement IV.B. of the umbrella liability policy sets forth that it "shall have no duty to pay defense, investigations, settlement or legal expenses" for an occurrence covered by the underlying insurance policy.[3] Since the district court held that Larry Julian's personal injury claim was covered by New Hampshire's policy, First State argues that it had no obligation to provide a defense for the plaintiffs.
 
 
 30
 The district court rejected First State's interpretation. It concluded that "First State's duty to defend was triggered as soon as New Hampshire made a decision to deny a defense to" the plaintiffs. Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 18 (D.Wyo. Aug. 11, 1988) (Memorandum and Order). The court determined that Insuring Agreement IV.A. "created an obligation for First State to defend any suit against an insured under the primary policy alleging personal injury if the primary carrier did not defend, with what amounts to a deductible of $25,000.00." Id.[4] In addition, the court stated that both New Hampshire and First State had an obligation to defend the plaintiffs "inasmuch as the complaint potentially stated a claim within the insurance coverage provided." Id. at 17.
 
 
 31
 We affirm the district court's ruling. The "not covered, as warranted" language of Insuring Agreement IV.A. establishes that First State must drop down for occurrences that are, in fact, covered by the underlying insurance policy despite the wrongful denial of coverage by New Hampshire. Under First State's reading of this provision, it is only obligated to drop down when occurrences are not covered by the underlying insurance but for which First State does provide coverage. This interpretation, however, fails to give meaning to the "as warranted" language in their policy. We must avoid an interpretation that renders contractual language meaningless. Wyoming Game and Fish Comm'n v. Mills Co., 701 P.2d 819, 822 (Wyo.1985).
 
 
 32
 Contrary to First State's construction, the term "as warranted" modifies "not covered." As written, the First State policy explicitly addresses the possibility that the primary insurer will wrongfully deny coverage for occurrences that it had warranted would be covered by its primary policy. The excess carrier must then drop down and provide a defense.[5]
 
 
 33
 First State's argument that Insuring Agreement IV.B. demonstrates that they were not obligated to drop down is unpersuasive. Under IV.B., First State has the right to associate with New Hampshire when New Hampshire is properly fulfilling its obligation to supply the insured with a defense, but is not required to pay legal expenses for that defense.[6] This provision, however, does not relieve First State of its independent obligation under IV.A. to drop down when New Hampshire has wrongfully declined to defend. First State's reliance on Insuring Agreement IV.B. to demonstrate that it is not obligated to drop down and defend is misplaced.
 
 
 34
 In addition, the difference in wording between Insuring Agreements IV.A. and IV.B. bolsters our conclusion. As discussed above, "not covered, as warranted" in IV.A. addresses occurrences for which New Hampshire wrongfully denies coverage despite warranting that coverage would be provided. The contrasting absence of "as warranted" in section IV.B. is significant: First State is not obligated to pay legal expenses when the underlying coverage applies to an occurrence for which New Hampshire is actually supplying a defense. It does not state that First State need not pay legal expenses when New Hampshire has wrongfully declined to defend. Consequently, First State's obligation to drop down in IV.A. is unaffected by IV.B.
 
 
 35
 Finally, Condition I of the First State policy is consistent with our interpretation of Insuring Agreement IV.A. Condition I states that First State must provide a defense for its insured when the underlying insurance is exhausted by payment of judgment or settlement. Unlike IV.A., it does not address the possibility that New Hampshire might wrongfully decline to defend. Instead, Condition I establishes First State's obligations under the different circumstance of the primary carrier's exhaustion of its $500,000.00 policy limit. It does not relieve First State of its duties under Insuring Agreement IV.A.[7]
 
 B.
 
 36
 Case law also demonstrates that First State breached its contractual obligation to defend Messrs. Hocker and Cummins. American Motorists Insurance Co. v. Trane Co., 544 F.Supp. 669 (W.D.Wis.1982), aff'd, 718 F.2d 842 (7th Cir.1983), was a declaratory judgment action by an excess carrier concerning its duty to defend if the primary carrier wrongfully refused to defend. The District Court for the Western District of Wisconsin interpreted a policy similar to First State's[8] and stated:
 
 
 37
 If the underlying insurer has refused to defend, asserting that there is no coverage under the substantive provisions of the underlying policy, the excess insurer will have a duty to defend, provided there is coverage under the excess policy and the claim falls within the policy limits of the excess insurer.
 
 
 38
 Id. at 692.
 
 
 39
 Applying the Trane test to the First State policy, the district court held that "where a primary insurer declines to defend a third-party action, an excess insurer under a policy containing a duty to defend must assume the insured's defense." Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 24 (D.Wyo. Aug. 11, 1988) (Memorandum and Order). First State contends that the district court misapplied the Trane test to the facts here.
 
 
 40
 We affirm the district court's holding. First State's argument is based on the erroneous premise that it had no duty to defend Messrs. Hocker and Cummins in the Julian case. However, as we concluded earlier, First State was obligated to drop down and defend under Insuring Agreement IV.A. after New Hampshire wrongfully refused to defend. Given this contractual obligation and the fact that Larry Julian's personal injury claim fell within First State's policy limits as the excess insurer, First State failed to satisfy its duty under Trane.
 
 
 41
 The result for the two other excess carriers in Trane does not alter our conclusion. First State analogizes itself to St. Paul Fire and Marine Insurance Company and American Home Assurance Company in Trane. St. Paul had issued a policy under which it had no duty to defend the insured. Condition No. 2 of the policy stated: "Notice of any accident, which appears likely to involve this Policy, shall be given to the Company which at is own option, may, but is not required to, participate in the investigation, settlement or defense of any claim or suit." Trane at 698 (emphasis added by district court).
 
 
 42
 The court held that St. Paul had no duty to defend because of the express language of Condition No. 2. Id. at 699. The court also held that American Home did not have a duty to defend because its excess policy only provided coverage if there was coverage under St. Paul's policy. Id. at 700.
 
 
 43
 Once again, the fault in First State's argument lies in its incorrect interpretation of Insuring Agreement IV.A. Unlike the St. Paul policy, the express language of IV.A. created a contractual obligation for First State to drop down and defend Messrs. Hocker and Cummins if New Hampshire wrongfully declined to provide a defense. First State's failure to defend is a breach of its contractual duty.
 
 C.
 
 44
 First State also claims that the district court ruled incorrectly when it stated that First State had a duty to defend Hocker and Cummins "inasmuch as the complaint potentially stated a claim within the insurance coverage provided." Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 17 (D.Wyo. Aug. 11, 1988) (Memorandum and Order). The district court's ruling stems from both its interpretation of Insuring Agreement IV.A. and established principles regarding the duty to defend.
 
 
 45
 An insurer's duty to defend is broader than its duty to indemnify. Western Chain Co. v. American Mut. Liab. Ins. Co., 527 F.2d 986, 989 (7th Cir.1975). Because an insurer must defend an action if there is the potential of liability under its policy, Spruill Motors, Inc. v. Universal Underwriters Insurance Co., 212 Kan. 681, 512 P.2d 403, 407 (1973), it has a duty to defend actions that may not ultimately result in an obligation to indemnify. See Solo Cup Co. v. Federal Ins. Co., 619 F.2d 1178, 1184 (7th Cir.), cert. denied, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).
 
 
 46
 First State does not dispute these principles. Instead, its claim is based on the mistaken theory that it was not obligated to defend Messrs. Hocker and Cummins once New Hampshire wrongfully failed to supply a defense. Given our conclusion to the contrary regarding First State's contractual obligations, we affirm the district court's ruling.
 
 
 47
 Our decision today does not alter the principal obligations of primary and excess carriers. The premium charged by a primary insurer is higher than that of the excess carrier because it is obligated to "conduct the investigation, negotiation and defense of claims until its limits are exhausted." 7C J.A. Appleman, Insurance Law and Practice, Sec. 4682 at 28 (Rev. ed. 1979). By comparison, an excess insurer's premiums are low because it does not assume these primary obligations. Transit Casualty Co. v. Spink Corp., 94 Cal.App.3d 124, 156 Cal.Rptr. 360, 367 (1979), overruled on other grounds by Commercial Union Assurance Cos. v. Safeway Stores, Inc., 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980).
 
 
 48
 Our ruling that First State had a duty to monitor whether the underlying insurer is properly fulfilling its obligations is consistent with its role as excess carrier and its contractual obligation to drop down and defend. Although First State must drop down in the unusual circumstance when the primary insurer wrongfully declines to defend, the principal responsibilities of each insurer are not changed. Normally, First State will not have to conduct the investigation, negotiation and defense of claims because the underlying insurer will be properly fulfilling its obligations. Moreover, an excess insurer who must drop down will not be left to bear the financial burden of providing a defense. It may recover from the defaulting primary carrier the costs expended in the defense as well as damages if the primary carrier's default was in bad faith. See Insurance Co. of N. Am. v. Medical Protective Co., 768 F.2d 315 (10th Cir.1985).[9]
 
 III.
 
 49
 First State also appeals the district court's dismissal of its crossclaim against New Hampshire under the doctrine of equitable subrogation.
 
 
 50
 In general, subrogation is applied to avoid unjust enrichment when one party, other than a volunteer, has discharged an obligation which should have been satisfied by another. Reese v. AMF-Whitely, 420 F.Supp. 985, 989 (D.Neb.1976). It is a device whereby a court compels the ultimate payment of an obligation by the party who in good conscience ought to pay it. Insurance Co. of N. Am. v. Medical Protective Co., 768 F.2d 315, 320 (10th Cir.1985).
 
 
 51
 The district court recognized that the remedy of equitable subrogation was available to First State due to New Hampshire's failure to defend the plaintiffs. Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 26 (D.Wyo. Aug. 11, 1988) (Memorandum and Order). However, the court concluded that First State was guilty of bad faith in failing to investigate the Julian claim to determine whether New Hampshire was providing a defense. Id. at 24. First State, therefore, lacked the "clean hands" necessary to invoke equity. Id. at 25.
 
 
 52
 On April 5, 1990, after the district court issued its Order, the Supreme Court of Wyoming established the test to determine bad faith when an insurer allegedly commits the tort of violating the duty of good faith and fair dealing. McCullough v. Golden Rule Ins. Co., 789 P.2d 855 (Wyo.1990). The court, in answering two questions certified from the United States Court of Appeals for the Tenth Circuit, stated that "the appropriate test to determine bad faith is the objective standard whether the validity of the denied claim was not fairly debatable."[10] Id. at 860. The Court adopted the analysis of Anderson v. Continental Insurance Co., 85 Wis.2d 675, 271 N.W.2d 368 (Wis.1978). In Anderson, the Supreme Court of Wisconsin stated the requirements for demonstrating a bad faith claim: "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." Id. 271 N.W.2d at 376.
 
 
 53
 The district court reached its conclusion that First State acted in bad faith by relying on Western Casualty and Surety Co. v. Fowler, 390 P.2d 602 (1964), the principal Wyoming case on insurance bad faith prior to the decision in Golden Rule. In Western Casualty, the Wyoming Supreme Court stated that "evidence of bad faith is present when the insurer fails to investigate the claim properly so as to be able to intelligently assess the probabilities [of success at trial]." Western Casualty, 390 P.2d at 605.[11] According to the district court, First State acted in bad faith by failing to investigate the Julian claim to determine whether New Hampshire was providing a defense.
 
 
 54
 Although it is unclear whether First State's failure to investigate the Julian claim satisfies the fairly debatable standard articulated in Golden Rule, we need not undertake that analysis in order to affirm the district court's ruling. Even if First State's behavior did not rise to the level of bad faith, it is nevertheless guilty of "unclean hands."
 
 
 55
 First State asserts that New Hampshire should pay First State for the damages assessed against it because it was New Hampshire's bad faith refusal to defend that allegedly resulted in First State's liability. This court will not grant the equitable remedy of subrogation in these circumstances. The person asserting the right to subrogation must be without fault. Camden Trust Co. v. Cramer, 136 N.J.Eq. 261, 40 A.2d 601, 603 (N.J.Err. & App.Ct.1945); Huey v. Brand, 92 S.W.2d 505, 507 (Tex.Civ.App.1936). Moreover, one of the fundamental principles of equity is that "he who seeks equity must come into the court with clean hands." Lewis v. State Bd. of Control, 699 P.2d 822, 827 (Wyo.1985). In this case, First State breached its contractual duty to drop down and defend Messrs. Hocker and Cummins once New Hampshire refused to provide a defense. As an incident of this contractual obligation, First State was obligated to monitor the Julian claim to find out whether New Hampshire was supplying a defense. T.W. Ross, the First State employee handling the Julian file, closed the claim file without determining whether Messrs. Hocker and Cummins were being defended. In addition, although First State knew about New Hampshire's identity as the underlying insurer, it did not tell New Hampshire that it was the excess carrier nor did it request New Hampshire to give notice if a defense was not forthcoming. While this level of misbehavior may not rise to the level of bad faith in Golden Rule, First State does not have clean hands due to its contractual breach. See Cordis Corp. v. Prooslin, 482 So.2d 486, 490 (Fla.Dist.Ct.App.1986); Hardee v. Alexander, 182 S.W. 57, 60 (Tex.Civ.App.1915); Newby v. Laurence, 84 Neb. 622, 121 N.W. 965 (1909).
 
 
 56
 We are not faced with a subrogation claim where, to do justice, New Hampshire ought to pay First State's settlement with Messrs. Hocker and Cummins. The jury assessed damages against each insurer for breach of contract and for bad faith. Both insurers settled. First State paid for their own misconduct, not the obligation of New Hampshire. In this situation we will not use our equitable powers to require that New Hampshire bear the expense of First State's failure to fulfill its own contractual duties. Accordingly, we affirm the district court's ruling.
 
 IV.
 
 57
 First State also appeals the district court's refusal to recognize a direct cause of action by an excess insurer against a primary insurer independent of equitable principles under Wyoming law. In effect, First State argues that New Hampshire was guilty of more egregious misconduct in refusing to defend Messrs. Hocker and Cummins and that it should be allowed to recover according to the comparative fault of the two insurers. First State refers us to several cases from other jurisdictions that have acknowledged such a direct claim despite the lack of contractual privity between the two carriers.
 
 
 58
 In Transit Casualty Co. v. Spink Corp., 94 Cal.App.3d 124, 156 Cal.Rptr. 360 (1979), overruled on other grounds by Commercial Union Assurance Cos. v. Safeway Stores, Inc., 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (Cal.1980), the insured unreasonably refused to agree to a settlement proposal within the limits of the primary policy. As a result, the excess insurer was required to pay $175,000.00 to satisfy a jury verdict. The excess insurer claimed that both the primary insurer and the insured had unreasonably rejected the settlement proposal thereby causing the excess carrier to incur increased payments.
 
 
 59
 Equitable subrogation failed to provide a remedy to the excess carrier. Because the rights of the subrogee can rise no higher than those of the subrogor, the excess carrier gained nothing from stepping into the shoes of the insured who had acted in bad faith in refusing to settle. Id., 156 Cal.Rptr. at 365.
 
 
 60
 In recognizing a direct cause of action against the primary insurer, the court emphasized the triangular interrelationship between insured, primary carrier and excess carrier:
 
 
 61
 The buyer of separate primary and excess coverage generally occupies relationships with two (or more) carriers. Usually, these have no contractual privity Inter se. They are however fully aware of their respective roles and of the significant differences in their obligations to the insured for which greater or lesser premiums are charged. When an accident occurs, they become totally aware of each other. When the settlement value of the injury hovers over the upper limit of primary coverage, the two carriers face interacting problems of claim adjustment, settlement and defense. Each has a choice of mutual support or naked self-interest. The law, then, would be unrealistic in demanding that either carrier use the policyholder as its stepping stone to the assertion of a mutual obligation to each other. Triangular reciprocity is far more rational.
 
 Id.[12]
 
 62
 Spink's direct cause of action between the excess and primary insurers, although itself independent of equitable subrogation, is nonetheless based on equitable principles. The court acknowledged that equitable subrogation was a descendant of historic equity practice. Id., 156 Cal.Rptr. at 365. It was used "to achieve a just result by clothing a party with a right of recovery when he would otherwise be defeated by lack of privity." Id. It was precisely because equitable subrogation failed to achieve "evenhanded justice" in these circumstances that the court looked to other remedies to achieve a just result. Id. The excess carrier, through no fault of its own, was estopped from asserting an equitable subrogation claim because of the unreasonable rejection of a settlement offer by the insured/subrogee. Thus, the court's adoption of a direct claim sounding in tort was derived from, and expanded upon, the same equitable concerns that motivated adoption of an equitable subrogation remedy: the need to look beyond the lack of contractual privity between excess and primary insurers in order to achieve a fair result.
 
 
 63
 The district court, interpreting unsettled Wyoming law, correctly refused to recognize any direct claim for First State against New Hampshire in this case. Equitable subrogation does not fail to achieve evenhanded justice in these circumstances. Nor does the lack of privity deny First State a remedy. Rather, it is First State's own wrongdoing (its breach of its contractual duty to defend) and failure to satisfy the requirements of equity that prevent it from recovering from New Hampshire. Unlike the innocent excess carrier in Spink, First State's unclean hands prevents its assertion of an equitable subrogation claim. Under these circumstances, the district court correctly refused to recognize a direct tort cause of action based on equitable principles.
 
 
 64
 Two other cases that have recognized a direct cause of action are worthy of note. In Hartford Accident & Indemnity Co. v. Michigan Mutual Insurance Co., 93 A.D.2d 337, 462 N.Y.S.2d 175 (N.Y.App.Div.1983), aff'd, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608, the primary carrier failed to implead an injured worker's employer in the worker's personal injury suit against the employer's parent corporation because the insurer would have been liable as the employer's worker's compensation carrier. Consequently, Hartford, the excess insurer, had to contribute more toward the settlement after the primary coverage was exhausted.
 
 
 65
 Although the court acknowledged that Hartford became the equitable subrogee of its insured upon payment under its excess coverage, that theory of recovery was not before the court. Instead, the court found that Hartford's direct cause of action was the "result of the independent and direct duty" the primary carrier owed to Hartford as excess insurer and was "not dependent upon equitable principles of subrogation." Hartford, 462 N.Y.S.2d at 178.
 
 
 66
 First State also cites the decision in Ranger Insurance Co. v. Home Indemnity Co., 714 F.Supp. 956 (N.D.Ill.1989). Ranger Insurance Co., the excess insurer, claimed that the primary carrier's failure to engage in reasonable settlement negotiations rendered Ranger liable for $288,989.00 of a judgment. Although Illinois law supported Ranger's equitable subrogation to the rights of its insured, Ranger did not base its claim on this theory of relief. Instead, Ranger contended that a primary carrier owed a direct duty to the excess carrier to attempt to settle within the primary coverage ceiling. Id., 714 F.Supp. at 961.
 
 
 67
 Despite the lack of controlling Illinois precedent, the district court found that Illinois would allow an excess insurer to bring suit in its own right. The court based its decision on tort principles. It found that Illinois law imposes a duty of care when two conditions are met: "the alleged tortfeasor could have reasonably foreseen that its conduct would injure the plaintiff and policy considerations justify placing the risks and the burden of care on the defendant." Id. Both conditions were satisfied under the circumstances presented.
 
 
 68
 Even if this court was to look to Wyoming tort law and set aside equitable principles to fashion a remedy for First State, we conclude that Wyoming would not impose a direct duty of care running from the primary carrier to the excess carrier in the circumstances of this case.
 
 
 69
 Like Illinois, the imposition of a duty of care under Wyoming law requires that the alleged tortfeasor could have reasonably foreseen that its conduct would injure the plaintiff. Brubaker v. Glenrock Lodge Int'l Order of Odd Fellows, 526 P.2d 52, 58-59 (Wyo.1974). In addition, policy considerations must justify placing the risks and the burden of care on the defendant. Ranger, 714 F.Supp. at 961.
 
 
 70
 We do not believe the district court erred when it refused to recognize a tort cause of action in these circumstances. Even if we assumed that it was reasonably foreseeable to New Hampshire that there was an excess carrier in this case (a fact not actually known to New Hampshire), we conclude that policy concerns do not warrant placing the burden of care on New Hampshire to discover and notify First State of its refusal to defend Messrs. Hocker and Cummins.
 
 
 71
 The jury returned verdicts against New Hampshire and First State for their respective breaches of contract and good faith. First State now seeks to have New Hampshire pay for First State's contract breach and bad faith as well as its own. To allow recovery for First State would be to excuse, at least in part, their breach of contract. First State agreed to drop down and defend Messrs. Hocker and Cummins regardless of whether New Hampshire's refusal to defend was willful or negligent. Having failed to perform their contract, First State will not be allowed to thrust the consequences of their breach onto New Hampshire, particularly where First State knew of the underlying claim yet failed to notify New Hampshire of First State's existence. We will not relieve First State of its contractual obligations. Nor will we grant First State a tort cause of action so that New Hampshire may bear the loss occasioned by First State's misconduct.
 
 
 72
 In addition, allowing First State to recover from New Hampshire will decrease its incentive to fulfill its contractual obligation to drop down in the event the primary insurer fails to defend. Without the availability of a tort cause of action, an excess insurer deciding whether to drop down weighs the possibility the primary incorrectly concluded the insureds were not covered. If the primary's decision is correct and the excess does drop down, the excess insurer will be left to pay a judgment entered against the insured.[13] If, however, the primary's conclusion is wrong and the excess carrier does not drop down, the excess will face a breach of contract judgment and the possibility of a judgment for bad faith breach. The decision to drop down, therefore, is based on the excess carrier's exposure to the risk that it will have to pay these amounts.
 
 
 73
 If we inject the availability of a tort claim into this equation, the excess carrier's incentive to drop down would decrease due to its reduced exposure to the risk of paying damages for breach of contract and bad faith. An excess carrier will decide whether to drop down based on its exposure to damages for breach of contract and bad faith less the amount it could recover from the primary through a tort action. When it compares this reduced exposure to the possibility that it may have to pay the entire judgment if it drops down and the primary correctly decided the insureds were not covered, the excess insurer will have less incentive to fulfill its contractual duties than it would without the availability of a tort claim. We are not persuaded that Wyoming would adopt a policy which interferes with the parties' contractual relationship by creating new causes of action which result in disincentives that thwart the fulfillment of those contractual obligations.
 
 
 74
 Wyoming has not yet adopted a direct cause of action for an excess insurer against a primary insurer. While it may adopt the direct cause of action in some circumstances, we are not persuaded that it would use these facts and this context to do so. We do not believe that it would create a duty of care that would relieve an excess insurer of the consequences of its own contractual breach.[14] The district court's interpretation of Wyoming law is therefore affirmed.
 
 V.
 
 75
 To summarize: We hold that First State breached its contractual obligation to drop down and defend plaintiffs Hocker and Cummins once New Hampshire wrongfully refused to defend; that First State's unclean hands bars its equitable subrogation cross-claim against New Hampshire; and that the district court correctly interpreted unsettled Wyoming law in refusing to recognize a direct cause of action independent of equitable principles in these circumstances.
 
 
 76
 AFFIRMED.
 
 
 
 [1]
 Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation
 
 
 [2]
 First State's policy defines insureds to include those covered by the underlying insurance policy. The district court held that Messrs. Hocker and Cummins were insureds under New Hampshire's primary liability policy. In addition, Definitions E(2), E(4) and E(5) of the umbrella policy defines insureds as including partners of Burns Drilling, certain officers, directors and stockholders, and any person or organization acting as real estate manager of Burns Drilling. These individuals are not insureds under the New Hampshire policy
 
 
 [3]
 Insuring Agreement IV.B. states:
 IV. DEFENSE--SETTLEMENT
 B. When underlying insurance, whether or not listed in Schedule A, does apply to an OCCURRENCE, the COMPANY shall have no duty to pay defense, investigations, settlement or legal expenses covered by such underlying insurance; however, the COMPANY shall have the right and opportunity to associate with the INSURED and any underlying insurer in the defense and control of any claim or suit reasonably likely to involve the COMPANY under this policy.
 
 
 [4]
 The First State insurance policy contained a "retained limit" of $25,000.00 that was, in effect, a deductible for that amount. Hocker v. New Hampshire Ins. Co., No. C87-239-B, at 18 (D.Wyo. Aug. 11, 1988) (Memorandum and Order)
 
 
 [5]
 Other cases have interpreted "not covered." For example, in Mission National Insurance Co. v. Duke Transportation Co., Inc., 792 F.2d 550 (5th Cir.1986), the court explained that "when an excess insurer uses the term 'covered' or 'not covered,' it is agreeing to drop down only in the event that the terms of the underlying policy do not provide coverage for the occurrence or occurrences in question." Id., 792 F.2d at 553
 Significantly, inclusion of the term "as warranted" modifies "not covered" and changes First State's obligation; the excess carrier agrees to drop down when the terms of the underlying policy warrant that coverage is provided for the occurrence, but the primary insurer nevertheless wrongfully denies coverage.
 
 
 [6]
 If First State had properly fulfilled its obligation of dropping down and defending Messrs. Hocker and Cummins, it would be able to maintain a subrogation claim against New Hampshire to recoup, among other things, the legal expenses incurred. See Insurance Co. of N. Am. v. Medical Protective Co., 768 F.2d 315 (10th Cir.1985)
 
 
 [7]
 Our conclusion is supported by one of the major treatises on insurance law:
 Of course, the insured should not be left without a prompt and proper defense and if a primary insurer fails to assume the defense, for any reason, the excess carrier still has the obligation to provide a defense and, to do justice, should be entitled to recoup its costs from the primary insurer.
 7C J.A. Appleman, Insurance Law and Practice, Sec. 4682 at 33 (Rev. ed. 1979).
 
 
 [8]
 The American Motorist policy provided that
 [w]ith respect to any occurrence not covered by (1) the underlying policy(ies) listed in Declaration 7--Schedule of Underlying Insurance, or (2) any other underlying insurance available to the insured and provided such occurrence is covered by the terms and conditions of this policy, ... the company shall:
 (a) defend any suit seeking damages because of personal injury, property damage or advertising liability, even if the allegations of such suit are groundless, false, or fraudulent, provided (1) the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient....
 Trane, 544 F.Supp. at 692.
 
 
 [9]
 To demonstrate that they were not obligated to defend, First State cites several cases which hold that the excess carrier is not required to drop down when the primary carrier is insolvent. See Harville v. Twin City Fire Ins. Co., 885 F.2d 276 (5th Cir.1989); Ware v. Carrom Health Care Products, Inc., 727 F.Supp. 300 (D.Miss.1989). First, these cases are not in point because they construe the contractual obligations of an excess carrier based on whether the underlying insurance is "collectible" or "recoverable." Unlike this case, they do not focus on the meaning of "not covered, as warranted."
 However, these cases are noteworthy for their policy justifications. In Harville, the Fifth Circuit observed that excess insurers would bear the risk of the primary carrier's insolvency if they were required to defend when the primary would have done so but for its insolvency. Harville, 885 F.2d at 279. The excess carrier would be unable to recover its expenses. By contrast, an excess carrier that undertakes to drop down when a financially healthy primary insurer wrongfully refuses to defend will be able to sue the primary insurer to recover its costs. More importantly, the insured will not be left facing a default judgment.
 
 
 [10]
 The court considered two questions certified from the Tenth Circuit:
 Does an insurance company owe a duty of good faith to its policyholders not to unreasonably deny a claim for benefits under the policy, the breach of which duty gives rise to an independent tort action?
 If such a tort action is permitted, in addition to showing that the claim was denied unreasonably and without proper cause, must the policyholder demonstrate that the insurance company intentionally, knowingly, or recklessly denied the claim for benefits?
 Golden Rule, 789 P.2d at 855.
 The court answered "yes" to the first question, but established the "fairly debatable" analysis in answering the second. Id.
 
 
 [11]
 In Western Casualty the insureds sued their primary insurer, Western Casualty and Surety Company, on the ground that it was guilty of bad faith refusal to settle after ignoring evidence of negligence. The refusal to settle exposed the insureds to liability in excess of the policy limits. Id. at 604. The court concluded that Western Casualty's failure to conduct an adequate investigation constituted bad faith. Id. at 605
 
 
 [12]
 In Commercial Union Assurance Cos. v. Safeway Stores, Inc., 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (Cal.1980), the California disapproved Spink "insofar as it holds that an insured's duty of good faith and fair dealing to his excess carrier compels him to accept a settlement offer or proceed at his peril where there is a substantial likelihood that an adverse judgment will bring excess insurance into play." Id., 164 Cal.Rptr. at 714, 610 P.2d at 1043 (emphasis added). Thus, the California Supreme Court did not overrule the Spink theory of triangular reciprocity
 
 
 [13]
 Of course, if the primary is wrong and the excess does drop down, the excess insurer will be able to recoup, through subrogation, a money judgment entered against the insured that the excess paid. See Insurance Co. of N. Am. v. Medical Protective Co., 768 F.2d 315 (10th Cir.1985)
 
 
 [14]
 In light of our conclusion that Wyoming would not recognize a direct duty of care in the circumstances of this case, we need not resolve such difficult questions of whether Wyoming's comparative negligence statute would apply to such an action or other problems such as the appropriate standards for contributory negligence, standards of proof, and presumptions when creating tort duties between parties whose relationship stems from their contractual obligations to the insured