INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellee,

v.

The MEDICAL PROTECTIVE COMPANY, Defendant-Appellant.

No. 83–2082.

United States Court of Appeals, Tenth Circuit.

July 25, 1985.

Benjamin F. Stapleton, Denver, Colo. (John H. Evans, Owen C. Rouse and Marion A. Brewer, Denver, Colo., with him on the briefs) of Ireland, Stapleton, Pryor & Pascoe, P.C., Denver, Colo., for defendant-appellant.

Frederick K. Starrett, Topeka, Kan. (Eugene B. Ralston, Topeka, Kan., with him on the brief) of Ralston & Frieden, Topeka, Kan., for plaintiff-appellee.

Before BARRETT, BREITENSTEIN and TIMBERS *, Circuit Judges.

TIMBERS, Circuit Judge.

Medical Protective Company (Medical Protective) appeals from a judgment entered August 5, 1983 in the District of

---

* Honorable William H. Timbers of the Second Circuit, sitting by designation.

Kansas, Dale E. Saffels, *District Judge,* in favor of Insurance Company of North America (INA), holding that Medical Protective, as the primary insurer of one Dr. Peter Torbey, had acted negligently and in bad faith in failing to settle within its policy limits a medical malpractice claim which had been asserted against Dr. Torbey. As a result, the court awarded INA, the excess insurer of Dr. Torbey, $323,121.90, the sum it was required to pay in order to satisfy the judgment for damages against Dr. Torbey in the malpractice action. The court also denied Medical Protective's request that INA be required to contribute a pro rata share of Medical Protective's costs in defending Dr. Torbey.

For the reasons stated below, we affirm.

### I.

We shall summarize only those facts believed necessary to an understanding of our rulings on the issues raised on appeal.

In April 1969, Lois Laptad, a married, thirty-seven year old mother of two, entered the Wesley Medical Center in Wichita, Kansas, for diagnostic tests to be performed by Dr. Peter Torbey, a radiologist. Dr. E.J. Fieldman was to administer a general anesthetic. On the day of the procedure, Dr. Fieldman supervised William Mohan, a Certified Registered Nurse and Anesthetist, and Ms. Reese, a student anesthetist, in the administration of the anesthetic Innovar, manufactured by McNeil Laboratories. Once the anesthetic was administered, Dr. Fieldman left the room. While Dr. Torbey was out of the room preparing for the radiological procedure he was to perform, Mohan noticed that Laptad had fallen into an unusually deep state of anesthesia. He left the room to find Dr. Fieldman. Laptad was left alone with the student anesthetist. Dr. Torbey reentered the room and began the radiological procedure. Subsequently he noticed that Laptad had no pulse. Both Dr. Torbey and the student anesthetist became alarmed. The student attempted various emergency measures in an effort to revive Laptad. Dr. Torbey did nothing. Even though Dr. Torbey was the only physician in the room at the time, he was of the opinion that, as a radiologist, he should not involve himself in what appeared to be an anesthesiological problem. Laptad sustained severe brain damage as a result of these actions and inactions. She remained in a semicomatose state in a nursing home for the next seven years—until she died.

The administrator of Laptad's estate commenced a negligence action in the district court against Doctor Fieldman; his assistants, Doctors Glenn Martin and M.M. Tinterow; Doctor Torbey; William Mohan; Laptad's referring general physician, Doctor J.T. Stewart; Wesley Medical Center; and McNeil Laboratories. Prior to trial, the Laptad estate settled with Drs. Fieldman, Martin, and Tinterow for $300,000, and with the Wesley Medical Center for $75,000. The case against Mohan and Dr. Stewart was dismissed. The remaining defendants at the time of trial were Dr. Torbey and McNeil Laboratories.

The first trial in November 1974 ended with the jury unable to reach a verdict. A second trial in July 1975 ended with a verdict in favor of the Laptad estate against Dr. Torbey. McNeil was found not liable. The jury awarded the Laptad estate $750,000, which was reduced by the $375,000 settlement reached with the other defendants. The judgment entered on the jury verdict was affirmed by our Court. *Lupton v. Torbey,* 548 F.2d 316 (10th Cir.1977). Medical Protective, as the primary insurer of Dr. Torbey, had a policy limit of $100,000. INA, as the excess insurer of Dr. Torbey, had a policy limit of $1,000,000. As a result of the judgment, INA was required to pay $323,121.90, representing the balance remaining due on the judgment after exhaustion of the Medical Protective policy.

INA subsequently commenced the instant action in the district court, claiming that Medical Protective acted negligently and in bad faith in pursuing settlement negotiations in the action between the Laptad estate and Dr. Torbey, and in failing to settle that claim within the limits of the

Medical Protective policy. The court found the following facts with regard to the settlement negotiations in the *Laptad* action, all events being in 1971 unless otherwise stated.

Medical Protective was obligated to defend Dr. Torbey. For that purpose it retained Emmet Blaes, Esq. of Wichita, Kansas. Nearly all of Medical Protective's contacts with Dr. Torbey concerning the *Laptad* action were through Blaes. Counsel for the Laptad estate, Gerald Michaud, Esq., stated in December 1970 at a pre-trial conference with counsel for all the defendants that Dr. Torbey would be sued for negligence as the "captain of the ship". Dr. Torbey had been the only doctor present in the room when the crisis occurred but had done nothing except stand by while Laptad suffered irreversible brain damage.

On January 4, Michaud, an experienced attorney in medical malpractice cases, offered to settle with all defendants for $500,000. Blaes and counsel for the other defendants considered the offer to be a reasonable one. On January 11, Blaes informed Medical Protective that the case against Dr. Torbey was strong enough to go to a jury and that, on the basis of sympathy alone, a jury might well return a verdict in favor of the Laptad estate. Blaes, however, recommended that Dr. Torbey's contribution to any joint settlement fund be minimal. On February 1, Blaes requested authorization to offer $25,000 as Dr. Torbey's contribution to such a fund. On February 3, Medical Protective agreed to this request.

On January 29, at a meeting of all defense counsel, William Tinker, Esq.—an attorney retained by INA to defend its insured, Dr. Fieldman—stated that experts consulted by him were critical of everyone involved, and especially Dr. Torbey because of his inaction at the critical time.

In February, Medical Protective indicated that it would rather take its chances on winning a jury verdict than offer a very high figure to the Laptad estate to settle the case. Medical Protective told Blaes

that they would be willing to increase the $25,000 settlement offer only slowly and reluctantly.

On February 12, Tinker offered Michaud $325,000 to settle the case on behalf of all defendants. Dr. Torbey was never informed of the offer. Michaud rejected the offer. On February 15, defense counsel made an offer of $400,000. Michaud rejected this offer. This latest offer would have included a $50,000 contribution for Drs. Torbey and Stewart, the latter still being a co-defendant. Dr. Torbey was never informed of this offer.

On February 17, Wesley Medical Center settled with the Laptad estate for $75,000. During the negotiations of January and February, INA received personal reports from Blaes concerning some aspects of the negotiations, as well as some of the correspondence between Blaes and Medical Protective.

In April, Dr. Fieldman settled with the Laptad estate for $300,000. During discovery proceedings, Tinker represented to Michaud and the district court that this was the total amount of Dr. Fieldman's insurance coverage. Dr. Fieldman, in fact, actually was insured to the extent of $1,100,000.

On June 9, Michaud offered to settle with Drs. Torbey and Stewart for $75,000 —$50,000 of which would be Dr. Torbey's contribution. Medical Protective refused to negotiate on the basis of this offer. The offer was never communicated to Dr. Torbey. On July 12, without authority from Medical Protective, Blaes offered Michaud $37,500. Medical Protective eventually did authorize this amount in November. It never authorized a higher amount.

The court found that, under all the circumstances, Michaud's offer to settle with Drs. Torbey and Stewart for $75,000 was reasonable. Blaes himself testified that he would have been comfortable settling the case for $50,000–$60,000. In August 1972, Michaud received a report highly critical of Dr. Torbey's conduct and withdrew his $75,000 offer. In September 1972, Blaes

informed Medical Protective of this report and of his belief that the Laptad estate's damages might be greater than previously had been expected. Medical Protective did not re-evaluate its position. In September 1974, INA informed Medical Protective that it expected Medical Protective to settle the case for an amount within its $100,000 policy limit. On September 23, 1974, Blaes suggested to Medical Protective that it raise its $37,500 offer by $5,000. Medical Protective rejected this suggestion. It stated that it would rather pay Blaes to try the case than pay the Laptad estate any amount. On October 11, 1974, Michaud told Blaes that he would be willing to accept something less than $75,000 to settle the case against Dr. Torbey—the case against Dr. Stewart having been dismissed—but that this offer, and all prospects for settlement, would terminate on October 15 when Michaud made his opening statement to the jury. Medical Protective never responded to this offer.

The court found that Dr. Torbey was not informed or advised of any settlement offers, demands or negotiations prior to October 17, 1974. On that date he was informed that the Laptad estate had offered to settle for around $75,000. He was not told that Medical Protective had determined not to settle for a figure higher than $37,500. He was not told that he could protect his professional reputation by settling while denying liability. He was not told that he might be exposed to liability above Medical Protective's policy limits. He was not told that he should consider retaining private counsel to protect his own interests. On October 17, Blaes dictated a letter for Dr. Torbey's signature in which he had Dr. Torbey state that he never wanted any settlement which would recognize fault or liability on his part. He also stated that, since all settlement negotiations had failed, he wished to proceed to trial.

With these facts in mind, we shall consider the legal issues presented.

## II.

We turn first to Medical Protective's primary contention on appeal—that it cannot be held liable for failing to effect a settlement since Dr. Torbey did not approve and, so it claims, would not have approved any settlement in the *Laptad* action. Medical Protective places massive reliance on Paragraph D of its policy with Dr. Torbey which states that the "company shall not compromise any claim hereunder without the consent of the insured", and on Dr. Torbey's deposition testimony, portions of which tend to indicate that Dr. Torbey was opposed to the idea of settling the *Laptad* action and was aware of the consequences of that decision. We find that Medical Protective's claim ignores critical facts and does not ring true. We reject it.

██ First, we agree with the district court that the consent clause quoted above is immaterial to the question of whether Medical Protective acted in bad faith in pursuing settlement negotiations with Michaud. It is common practice for an insurer to conduct settlement negotiations in advance of obtaining the insured's final consent to the agreement. These negotiations must be conducted in good faith and without negligence, *Bollinger v. Nuss,* 202 Kan. 326, 333, 449 P.2d 502, 508 (1969), regardless of whether or not the insured eventually will consent.

Second, although Dr. Torbey testified in his deposition that, because he believed he was innocent of any wrongdoing, he never wanted to settle the *Laptad* action, he also testified that he would not have prevented Medical Protective from settling the case and would have relied on the advice of his attorney, Blaes, in determining whether or not to settle. Also, Medical Protective's claim that Dr. Torbey steadfastly had refused from the beginning to permit a settlement is plainly inconsistent with its efforts on his behalf to effect such a settlement—albeit halfhearted efforts undertaken in bad faith. *See* Part IV, *infra,* of this opinion. This claim is further contradicted by Dr. Torbey's October 17, 1974 letter wherein he states only that he never

wanted a settlement which would have recognized fault or liability on his part, and that since settlement negotiations had not succeeded, he wished to proceed to trial.

Third, the court held that any lack of consent by Dr. Torbey was immaterial since he had not been informed of any settlement negotiations until after Michaud's October 15, 1974 deadline for completing such negotiations. The court also found that Dr. Torbey had never been informed of the strong possibility that the Laptad estate might recover a judgment against him in excess of the Medical Protective policy limit. Dr. Torbey's testimony as to knowledge of settlement negotiations is vague, contradictory, and marked by significant lapses of memory.

▇ Based on all the evidence on this point, we hold that the district court's finding that Dr. Torbey was not kept informed concerning settlement negotiations was not clearly erroneous. Fed.R.Civ.P. 52(a).

▇ Furthermore, we reject Medical Protective's suggestion that the court did not properly consider Dr. Torbey's after-the-fact statements contained in his deposition testimony to the effect that his position would not have been different even if he had been completely informed. Once something no longer exists, it is very easy for a person to say that he did not want it anyway. We cannot be sure what course Dr. Torbey might have taken had he been aware of all the circumstances. Medical Protective had a duty to keep Dr. Torbey informed of all settlement negotiations. *Bollinger, supra*, 202 Kan. at 339, 449 P.2d at 512. It cannot escape the consequences of a breach of that duty by saying that it would not have made any difference even had it fulfilled its obligation.

### III.

The district court held that INA was entitled to be subrogated to the rights of Dr. Torbey under the Medical Protective policy in order to assert the claim that the latter acted in bad faith in failing to effect a settlement.

▇ Initially, it is important to recognize that subrogation is of two kinds, "legal" and "conventional". The former is grounded in equity and arises by operation of law, which gives to a third person who has been compelled to pay a remedy against one who, in justice, ought to pay. "Conventional" subrogation is grounded upon contract, express or implied. *City of New York Insurance Co. v. Tice*, 159 Kan. 176, 181, 152 P.2d 836, 839–40 (1944).

▇ In the present case, Dr. Torbey's policy with INA clearly states that INA "shall be subrogated to the extent of any payment hereunder to all of insured's rights of recovery therefore." To the extent that any of Dr. Torbey's deposition testimony might be construed as exculpating Medical Protective from any liability for its conduct of settlement negotiations, such testimony does not affect any of INA's rights under its contract with Torbey. *Id.* at 182, 152 P.2d at 840.

Medical Protective, however, argues that, since Dr. Torbey refused to consent to a settlement, he would have been precluded from bringing an action against Medical Protective for bad faith. Its argument continues that, since INA—as subrogee—could have no greater rights than the subroger, INA's action also must be barred. This argument fails for the reasons set forth in Part II, *supra*, of this opinion, namely, that any refusal by Dr. Torbey to consent to a settlement was immaterial since Medical Protective breached its duty to Dr. Torbey by failing to keep him adequately informed of the settlement negotiations or of his exposure to risk beyond the limit of the Medical Protective policy. *Bollinger, supra*, 202 Kan. at 339, 449 P.2d at 512.

▇ Medical Protective also argues that INA's action should be barred because INA failed to take any steps of its own to effect a settlement between the Laptad estate and Dr. Torbey. Medical Protective ignores Section II of INA's policy with Dr. Torbey which gives INA the right to defend or settle any claim against one of its insureds only where the occurrence is not

covered by an underlying policy of insurance such as the Medical Protective policy here. Under Kansas law, INA—as an excess insurer—was under no duty to defend Dr. Torbey. *American Fidelity Insurance Co. v. Employers Mutual Casualty Co.*, 3 Kan.App.2d 245, 255, 593 P.2d 14, 23 (1979).

■ Medical Protective further claims that INA should be estopped from claiming "legal" or "equitable" subrogation because it lacks the "clean hands" necessary to invoke equity. Medical Protective bases this claim on the alleged misrepresentation by Tinker—the attorney hired by INA to represent Dr. Fieldman—to Michaud and the district court in the *Laptad* action, that Dr. Fieldman's policy with INA had a coverage limit of $300,000 when, in fact, the policy provided for coverage up to $1,100,-000. First, as the district court observed, this allegation has yet to be proven. Second, the court was correct in concluding that, in spite of the fact that INA paid Tinker's bill, any misconduct of which Tinker may have been guilty could be attributed only to his client, Dr. Fieldman. ABA Code of Professional Responsibility DR 5–107(B). Third, any misrepresentation which may have occurred could have injured only Michaud and Laptad. Since Medical Protective is unable to show that it relied to its detriment on any misrepresentation by Tinker, it may not claim estoppel. *Cosgrove v. Young*, 230 Kan. 705, 718, 642 P.2d 75, 85 (1982).

We hold that the district court correctly concluded that INA was entitled to be subrogated to the rights of Dr. Torbey under the Medical Protective policy for the purpose of asserting the claim that the latter acted in bad faith in failing to settle within its policy limits.

## IV.

■ Turning to the district court's finding that Medical Protective acted in bad faith in failing to settle within its policy limits, it is axiomatic that, in defending and settling claims against its insured, an insurer owes to its insured a duty to act in good faith and without negligence. *Bollinger, supra*, 202 Kan. at 333, 449 P.2d at 508. In *Bollinger*, the Supreme Court of Kansas stated that the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general statement or definition. *Id.* at 338, 449 P.2d at 512. The court went on to set forth eight factors which had been indicated by the California Court of Appeals in *Brown v. Guaranty Insurance Co.*, 155 Cal.App.2d 679, 689, 319 P.2d 69, 75 (1957), as bearing upon the question of liability for acting in bad faith. These factors are: (1) the strength of the insured claimant's case on the issue of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of a compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer. Whether any of these factors has been established is a question of fact. The finding of the district court will not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a).

Before examining the correctness of the court's factual determinations on the issue of bad faith, we must consider Medical Protective's claim that the court misapplied the law by specifically referring to only two of the *Brown* factors. We reject this claim for several reasons. First, the *Bollinger* court did not expressly adopt all eight of the *Brown* factors as the test for bad faith in Kansas. Indeed, the court expressly declined to adopt any general rule. Such a case-by-case approach makes sense, since most actions will involve fewer

than all eight factors. In the instant case, for example, factors (2), (3) and (7) are simply not applicable. Second, in any particular case, under the proper circumstances, a single factor standing alone may be sufficient to support a finding of bad faith. Third, although the court in the instant case explicitly relied on only two of the *Brown* factors in determining bad faith— the strength of the case against Dr. Torbey and the amount of financial risk to which he was exposed—it actually relied on two others as well—the failure of Medical Protective to inform Dr. Torbey of compromise offers and Medical Protective's rejection of the advice of its attorney, Blaes.

■ With regard to the two factors which the court explicitly considered in determining bad faith, we hold that the court's findings are not clearly erroneous. A young, gainfully employed mother of two had suffered catastrophic injury. At the critical time, Dr. Torbey was the only physician in the room and yet he stood by and did nothing. There were expert reports which were highly critical of Dr. Torbey's conduct. Michaud, an experienced attorney in the medical malpractice field, was aware of the tactical significance of these reports. In view of these facts, together with probable jury sympathy for Laptad, the case against Torbey was strong. The court also was correct in concluding that Dr. Torbey was exposed to financial risk beyond the coverage provided by the Medical Protective policy. Blaes had suggested to Medical Protective that a jury verdict against Dr. Torbey in excess of $500,000 was not improbable. Michaud had expressed his belief to Blaes that the Laptad estate might recover as much as $1,000,000.

A finding of bad faith is further supported by two other factors discussed by the court in its opinion but not expressly relied upon by the court in determining bad faith. First, Medical Protective failed to keep Dr. Torbey adequately informed concerning settlement negotiations. We are not persuaded by Medical Protective's attempt to exculpate itself from liability by claiming that it reasonably could believe that Blaes—Dr. Torbey's attorney—would keep Dr. Torbey adequately informed of negotiations. The duty to inform was squarely that of Medical Protective. Second, there was evidence that Medical Protective rejected the advice of Blaes. Whether or not Blaes ever informed Medical Protective of his personal belief that the case against Dr. Torbey was worth about $50,000 to $60,000, he did inform Medical Protective on several occasions that Dr. Torbey might be in serious trouble. On at least one occasion he suggested raising the $37,500 offer. Medical Protective did not adjust its settlement position in response to this information; rather, it maintained its position that it would rather go to trial than pay the Laptad estate any amount over $37,500.

In light of all of the facts disclosed by this record, we hold that the district court was correct in concluding that there was no justification for Medical Protective's intransigence and that it acted in bad faith.

### V.

■ Medical Protective's final contention is that the district court erred in not requiring INA to contribute a pro rata share of the cost of defending Dr. Torbey. Medical Protective relies principally on *American Fidelity, supra,* in which the Kansas Court of Appeals stated that where "the claim is over the policy limits of the primary policy and only one insurer undertakes the defense, the primary insurer and the excess insurer will each be liable for a pro rata share of the costs of defense in proportion to the amount of the claim each is required to pay." *Id.* at 255, 593 P.2d at 23. The district court held that this statement was dictum and that it did not necessarily reflect the law of Kansas. We believe that the district court was correct. *American Fidelity* was a declaratory judgment action brought to determine the respective coverages and duties to defend of two insurance companies. *Id.* at 246, 593 P.2d at 16. The question of contribution by an excess insurer to the defense of its

insured where the primary carrier had provided a defense was simply not before the court. Also, the court itself recognized that under the facts of *American Fidelity* the excess insurer had not yet been exposed to any liability and therefore any likelihood of a duty to indemnify on the part of the excess insurer was "pure speculation". *Id.* at 251, 593 P.2d at 20. We agree with the district court that the Kansas court's statement regarding contribution was dictum since it went beyond the issues properly before the court.

Furthermore, in stating its dictum regarding contribution, the Kansas court relied heavily on the California Supreme Court decision in *Continental Casualty Co. v. Zurich Insurance Co.*, 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455 (1961) (en banc), which itself was compromised significantly by that court's more recent opinion in *Signal Companies v. Harbor Insurance Co.*, 2 Cal.3d 359, 165 Cal.Rptr. 779, 612 P.2d 889 (1980) (en banc).

*Continental* dealt with three insurers, each providing primary coverage with a primary obligation to defend. None of the three was an excess insurer as in the instant case. Each of the three carriers was requested to provide a defense and two of the three refused. As the court noted in *Signal*, "the insured [in *Continental*] potentially could have been left without a defense." *Id.* at 368–69, 165 Cal.Rptr. at 805, 612 P.2d at 895.

In *Signal*, the California court was faced—as we are in the instant case—with the obligation of a carrier that was expressly designated as an excess carrier. The court stated that in such a situation there was no reasonable basis for assuming that the reasonable expectations of either the insured or the primary carrier were that the excess carrier would participate in defense costs beyond the express terms of its policy. *Id.* at 369, 165 Cal. Rptr. at 805, 612 P.2d at 895. We do not believe that Medical Protective had any such expectation in the underlying *Laptad* action, inasmuch as it did not even request a sharing of defense costs until after the instant action was commenced.

The court in *Signal* went on to state that it "decline[d] to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise...." *Id.* In the instant case, Medical Protective had the primary obligation to defend and protect both its insured and, by subrogation, INA from excess liability. Dr. Torbey was entitled to an unlimited defense under his contract with Medical Protective, in contrast to his contract with INA, which obligated the latter to provide a defense only where primary coverage did not exist or had been exhausted. We find no equitable considerations justifying a departure from the express obligations embodied in these policies. Indeed, under all the circumstances of this case, we do not believe that Medical Protective is in any position to invoke equity in order to obtain contribution to Dr. Torbey's defense costs.

VI.

To summarize: We hold that Medical Protective acted negligently and in bad faith in pursuing settlement negotiations in the *Laptad* action; that INA is entitled to be subrogated to Dr. Torbey's right to assert a claim for bad faith against Medical Protective; and that Medical Protective is not entitled to contribution to Dr. Torbey's defense costs.

Affirmed.