(38 P.3d 757)
No. 85,351

LAYNE CHRISTENSEN CO., and ELGIN EXPLORATION COMPANY, LTD., *Appellees/Cross-appellants*, v. ZURICH CANADA, *Appellee/Cross-appellee*, and TIG INSURANCE COMPANY, *Appellee/Cross-appellant,* and RELIANCE NATIONAL INDEMNITY COMPANY, *Appellant/Cross-appellee*.

Opinion filed January 25, 2002.

*John M. Waldeck*, of Niewald, Waldeck & Brown, of Overland Park, and *Ira Lipsius* and *Andrew Karonis*, of Schindel, Farman & Lipsius, LLP, of New York, New York, for appellant/cross-appellee Reliance National Indemnity Company.

*Douglas M. Greenwald* and *Jeanne Gorman Rau*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellee/cross appellee Zurich Canada.

*Douglas R. Richmond* and *Gerald A. King,* or Armstrong Teasdale LLP, of Kansas City, Missouri, for appellee/cross-appellant TIG Insurance Company.

Before GERNON, P.J., KNUDSON and BEIER, JJ.

BEIER, J.: This appeal arises out of a truck accident in California which injured a 6-year-old. We must determine whether the primary insurance policy's coverage limit was stated in Canadian or United States dollars, and, if Canadian, whether either or both of two other policies come into play.

Reliance National Indemnity Company appeals from the district court's judgment (1) that the coverage limit was stated in Canadian dollars and thus Zurich Canada's insurance policy did not provide full coverage for the insureds' $2 million loss; (2) that Reliance's policy provided secondary coverage; and (3) that the excess insurer, TIG Insurance, was not responsible for any part of the $2 million loss. TIG cross-appeals, joining in Reliance's claim that Zurich's policy fully covered the loss and, in the alternative, opposing the assertion that Reliance's policy did not cover the loss.

We must address the following issues:
- Did Reliance acquiesce in the judgment, thereby barring all or part of this appeal?
- Did the district court err in finding Zurich's policy was not ambiguous?
- Did the district court err in applying Canadian law to interpret Zurich's policy?
- If Canadian law does apply in this case, did the district court properly interpret and apply Canadian law?
- If Zurich's policy does not fully cover the loss, did the district court err in finding Reliance's policy provided coverage for the loss? and
- Did the district court err in finding TIG's policy did not cover the loss in this case?

### Factual Background

#### The Parties

Layne Christensen Company (Layne) is a Delaware corporation with its principal place of business in Johnson County, Kansas. Elgin Exploration Company, Limited (Elgin) was incorporated in

and has its principal place of business in the province of Alberta, Canada. In December 1995, Layne acquired Elgin when it purchased Elgin's then-parent corporation, Christensen Boyles Corporation (CBC).

At all relevant times, Elgin and/or Layne were covered by automobile insurance policies issued by several different carriers, including the three involved in this case. Zurich Canada (Zurich), is a Canadian insurance company with its principal place of business in Ontario. TIG Insurance Company (TIG) is a California corporation with its principal place of business in Texas. Reliance National Indemnity Company (Reliance) is a Wisconsin corporation with its principal place of business in Pennsylvania.

## The Underlying Suit

In 1996, Elgin was working on a project in California. On August 26, 1996, an Elgin employee from the project was driving a truck rented by Elgin when he struck Devin Wallen, the 6-year-old child. Wallen was seriously injured.

Wallen and his mother filed suit in California state court against Elgin and the driver shortly after the accident. The *Wallen* suit was settled by Elgin in July 1997 for $2 million in United States dollars. Representatives of Zurich, TIG, and Reliance approved the settlement. Zurich contributed $1,456,133.96, the equivalent of $2 million Canadian dollars, toward the settlement. TIG and Reliance each paid $146,933.02, and Layne/Elgin contributed $250,000, all in United States dollars. All parties reserved their rights to seek a declaration of their respective obligations for the loss.

## The Zurich Policy

In July 1993, Johnson & Higgins Ltd. (J&H), an insurance brokerage firm based in Alberta, Canada, requested a price quote from Zurich for an automobile fleet insurance policy for Elgin. Although Elgin previously had insurance through its parent corporation CBC, Zurich was told Elgin wished to "remove themselves from the parent's insurance programme." The request sought a $2 million coverage limit but did not specify whether the limit was to be measured in United States or Canadian dollars. Zurich was in-

formed that Elgin operated primarily in Canada, but that Elgin had three trucks in the United States. Zurich provided Elgin a conditional price quote and requested additional details on its United States exposure.

Ultimately, Elgin accepted Zurich's quote and policy number 9991237F was issued for 1 year beginning August 24, 1993. Zurich charged the first year premium in Canadian dollars. The policy covered all vehicles Elgin owned, leased, or registered in its name. The coverage limit was $2 million; there was no deductible. Coverage extended to Elgin's automobiles while they were operated or parked within Canada, the United States, or upon a vessel plying between the two countries.

The Zurich policy and its later endorsements were silent as to whether the $2 million limit was measured in Canadian dollars if an accident occurred in the United States. No documents were provided to Elgin stating that claims would be calculated in Canadian dollars, even for accidents occurring in the United States. However, no explicit representation was made that such claims would be paid in United States dollars.

In August 1994, Zurich renewed Elgin's policy for a second 1-year period to run through August 24, 1995. Zurich charged a premium in Canadian dollars. The premium was financed and paid through J&H in Calgary. The policy was renewed for a third year in August 1995 in the same fashion.

In April 1996, after Elgin and its parent corporation had been acquired by Layne, Elgin notified Zurich its new insurance brokers were the Lockton Companies (Lockton) and its Canadian representative, Morris & Mackenzie, Inc. Lockton is a Missouri corporation with its principal place of business in Kansas. Morris & Mackenzie, Inc. (M&M), is a Canadian insurance broker with offices in Alberta, Canada.

In July 1996, Zurich notified M&M that it would not renew Elgin's fleet policy for a fourth year because of Elgin's loss history. A policy provision requiring 60 days' notice of nonrenewal prompted Zurich to offer to extend the policy's term to September 24, 1996. M&M requested the policy be extended. At about this same time, M&M advised Zurich that Elgin was going to use a

rented truck and five other vehicles on the California job. The rented truck identified in the notice was the truck ultimately involved in the Wallen accident.

At M&M's request, Zurich extended Elgin's policy to October 15, 1996, as reflected in endorsement 95-13. An additional premium was charged for the extension. Zurich also issued Endorsement No. 95-14, which re-rated the policy to include the six vehicles being used in California. The additional premium for this coverage was $7,002. "Re-rating" meant Zurich added a territorial surcharge because its exposure in California was higher. One of the factors used in determining the surcharge was the exchange rate between Canadian and United States dollars, although it appears to have exerted downward pressure on the surcharge. Another endorsement, No. 95-15, was issued adjusting Elgin's premiums for the policy period ending August 1996, requiring an additional payment.

During the years the Zurich policies were in effect, the insurance brokers billed Elgin for the premiums, accepted payments from Elgin, and then forwarded the payments less commissions to Zurich. The payments made by the brokers to Zurich included payments from Elgin and from other entities who had obtained Zurich policies through the brokers.

Regarding the 1996 endorsements, Zurich authorized M&M to bill Elgin for the additional premiums. M&M did not bill Elgin for those endorsements until December 1996 and January 1997 (after the Wallen accident). Apparently, M&M sent the invoices to Lockton in Kansas who, in turn, sent them to Layne.

In March 1997, Lockton issued a single invoice to Elgin to cover the premiums for Endorsement Nos. 95-13, 95-14, and 95-15. Within 2 weeks, Layne paid Lockton $23,682 in United States dollars for the endorsements. Lockton subsequently issued a check to M&M drawn on a United States bank and payable in United States funds. The check covered the premium for all of the endorsements, less Lockton's commissions. The premiums were paid in United States dollars without converting the charges for the currency exchange rate. Therefore, the payment exceeded $23,682 in Canadian dollars.

Between 1993 and 1996, any losses for which Elgin was indemnified under the Zurich policy were not paid in United States dollars. Neither Elgin nor Layne was aware of any United States claims having been paid by Zurich in United States rather than Canadian dollars, and the record is silent on whether there were, in fact, any claims in the United States. At various times, Zurich issued certificates to governmental entities verifying Elgin's insurance coverage; the certificates indicated the coverage was based on Canadian dollars, but it is apparent the certificates would not have been seen by Elgin personnel.

The Reliance Policy

Effective May 1, 1996, Reliance renewed policy number NKA 0121853-01 to Layne, providing automobile liability coverage for 1 year with a policy limit of $2 million. The renewal submission provided to Reliance by Layne's agent, Lockton, listed vehicles owned by or leased to Layne's United States operations.

The Reliance policy covered autos owned by the insured "as per schedule on file with company." The "Named Insured Endorsement" attached to the policy identified a number of companies covered by the policy; a revised endorsement included Elgin as a named insured. A "Broad Named Insured Endorsement" to the policy also stated that the named insured included Layne and/or "any corporation, subsidiary (including subsidiaries) or partnership" of which Layne owned more than 50 percent. Another endorsement issued later altered the Broad Named Insured Endorsement coverage; it indicated coverage would not apply when primary insurance, other than the Reliance policy, was payable. The amended endorsement states an effective date of May 1, 1996, but it also bears a date of "09/12/97." Reliance's counsel drafted this endorsement in June 1997—nearly a year after the Wallen accident—and it was revised to its current form by Lockton. Reliance conceded the amended endorsement was not issued until September 12, 1997, although it purportedly was effective May 1, 1996.

Reliance's policy stated it provided primary insurance for any auto the insured owned and excess insurance for any covered auto the insured did not own.

## The TIG Policy

Effective May 1, 1996, TIG issued an excess policy of casualty insurance to Layne, providing coverage for 1 year. The policy's coverage limit was $25 million. TIG agreed to pay all sums in excess of the applicable limits of the underlying insurance listed in an attached schedule. The attachment shows automobile liability coverage by Zurich and Reliance, both with $2 million policy limits.

## The Current Litigation

On August 20, 1997, Layne and Elgin (referred to collectively as "plaintiffs") filed this declaratory judgment action against Zurich, TIG, and Reliance in Johnson County District Court, seeking a declaration that they were fully covered by one or more of the policies for the *Wallen* accident. Plaintiffs claimed that Zurich's policy limit was based on United States dollars and that Zurich's policy was primary over the policies of TIG and Reliance. Plaintiffs also alleged that, if Zurich's policy limit was payable in Canadian dollars, TIG's policy provided the remaining coverage for the *Wallen* settlement. Plaintiffs asserted that neither Layne nor Reliance intended the Reliance policy to provide coverage for claims against Elgin. Finally, plaintiffs asserted that, if Zurich's coverage was limited and Reliance's policy provided coverage, plaintiffs were not obligated to pay any deductible.

All three defendants filed answers with counterclaims against plaintiffs and cross-claims against the other insurers. While discovery was proceeding, the trial court suggested the parties try to develop a comprehensive stipulation of facts to narrow the issues. Ultimately the parties filed a stipulation of fact consisting of 99 paragraphs and 50 attached exhibits. The parties specifically reserved their rights to assert additional uncontroverted facts on summary judgment.

Approximately 1 year after this action was filed, M&M notified Lockton that Elgin had overpaid its premium by paying it in United States dollars rather than in Canadian dollars. Lockton subsequently issued a $4,725.60 check to Elgin for the currency differential. Between March 1997 and August 1998, Zurich never advised Lockton or Layne the premium was overpaid.

All of the parties filed summary judgment motions on the issue of Zurich's policy limits. The court heard arguments and, on January 29, 1999, issued a memorandum and order. It concluded that the Zurich policy was made in Canada and that the law of Alberta, Canada, should control. Looking at Canadian law, the court concluded the coverage limit was stated in Canadian dollars. The court concluded the term "dollars" was not ambiguous as a matter of law and the parties' intent could be ascertained from their actions.

Approximately 1 year after summary judgment was entered in favor of Zurich, Reliance filed a motion for partial summary judgment to determine the extent of coverage, if any, under its policy. Plaintiffs and TIG also filed motions for summary judgment on this issue. A different district judge heard arguments on these motions in February 2000 and ruled against Reliance from the bench. In April 2000, the district court issued the journal entry setting forth its ruling. It found that Reliance's policy unambiguously provided coverage for the *Wallen* suit; that Reliance's coverage was excess to that provided by Zurich; and that Reliance was required to reimburse plaintiffs $250,000 and TIG $146,933.02, plus interest, for their contributions to the settlement.

Reliance filed a timely notice of appeal challenging both summary judgment orders. TIG filed a timely notice of cross-appeal. Plaintiffs also filed a notice of cross-appeal but have since abandoned that effort. We remanded the matter for determination of an appropriate bond, and Reliance later posted a bond as to TIG's judgment.

On November 30, 2000, Reliance executed a settlement agreement with plaintiffs. Under the agreement, Reliance paid $250,000 to the plaintiffs to settle all claims and plaintiffs' motion for attorney fees. In exchange, plaintiffs released Reliance from any and all liability arising from these cases. Plaintiffs also agreed to withdraw their attorney fees motion and discontinue collection efforts. Reliance reserved its right to pursue its appeal against Zurich and TIG, and plaintiffs assigned their rights to Reliance to prosecute all claims plaintiffs had against TIG and Zurich. The agreement gave Reliance full and sole authority to settle any claims on appeal, but the parties agreed to divide the proceeds of any judgment or

settlement favorable to Reliance based on a specified formula. The formula appeared to give the Plaintiffs a proportionate share of any judgment based on the interest Reliance was not paying in the settlement.

*Discussion*

Acquiescence by Reliance

We must first determine whether Reliance has acquiesced in any part of the district court's decision by settling with plaintiffs.

Acquiescence in a judgment, which cuts off the right of appellate review, occurs when a party voluntarily complies with the judgment by assuming the burdens or accepting the benefits of the judgment contested on appeal. *Varner v. Gulf Ins. Co.*, 254 Kan. 492, 494-95, 866 P.2d 1044 (1994). The rationale is that a party who voluntarily complies with a judgment should not be allowed to pursue an inconsistent position by appealing from that judgment. A party's actions impliedly acquiescing in the judgment are sufficient for application of this rule. *McDaniel v. Jones*, 235 Kan. 93, 101-02, 679 P.2d 682 (1984).

Because acquiescence involves a question of the appellate court's jurisdiction, the matter raises a question of law. See *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 414, 997 P.2d 681 (2000). Also, because it necessarily arises after a judgment is rendered, there is no standard of review that governs our consideration of the issue. We thus approach it in the same fashion we would approach any other question of law presented to us.

There were two judgments in this case. The first judgment included the trial court's rulings that Zurich's policy limit was $2 million in Canadian dollars and that Zurich had paid its full policy limit in the *Wallen* settlement. The second judgment included the second district judge's decisions that Reliance's policy provided secondary coverage, that Reliance was obligated to pay the balance of the *Wallen* settlement, and that TIG's excess coverage was not triggered.

Reliance relies heavily on *Foley Co. v. Scottsdale Ins. Co.*, 28 Kan. App. 2d 219, 15 P.3d 353 (2000), in arguing its appeal is not barred. In *Foley*, a general contractor and its insurer filed suit

against a subcontractor, the subcontractor's insurer (Scottsdale), and an insurance broker, seeking indemnification for damages paid in another lawsuit. Scottsdale filed a cross-claim against the insurance broker, alleging the broker breached its agency agreement by unilaterally listing the general contractor as an additional insured to Scottsdale's policy. The trial court held Scottsdale was required to pay a portion of the underlying judgment; the court also denied Scottsdale's cross-claims against the broker. Scottsdale appealed from the judgment entered in favor of the broker, but it paid the judgment entered against it in favor of the plaintiffs.

On appeal, the broker contended Scottsdale had acquiesced by paying the plaintiffs' judgment. This court noted that, by paying the plaintiffs, Scottsdale had acquiesced in part of the judgment but was not appealing from the ruling in favor of the plaintiffs. We recognized that Scottsdale's claim against the broker related to a separate judgment and that Scottsdale had "not adopted a position that is inconsistent with the judgment contested on appeal." 28 Kan. App. 2d at 223. Accordingly, there was jurisdiction.

Generally, acquiescence to one part of a judgment does not bar appellate review of a distinct, separate part of the judgment. See *First Nat'l Bank in Wichita v. Fink*, 241 Kan. 321, 324, 736 P.2d 909 (1987); *Brown v. Combined Ins. Co. of America*, 226 Kan. 223, 231, 597 P.2d 1080 (1979).

Reliance argues that, because it settled only with plaintiffs, it may still appeal from the judgments entered in favor of Zurich and TIG, emphasizing they were not parties to the settlement. When testing for acquiescence in a judgment, however, the focus has always been whether the position taken by the party on appeal is inconsistent with the judgment. See *First Nat'l Bank in Wichita*, 241 Kan. at 324; *Foley*, 28 Kan. App. 2d at 223. The parties to a settlement and those to an appeal need not be identical for acquiescence to occur. In *Brown*, the court found no acquiescence, even though the insurer paid the undisputed portion of the disability claim and appealed the remainder of the judgment; the parties involved in the payment were the same parties litigating the appeal. 226 Kan. at 231.

Reliance's settlement with the plaintiffs is *not* inconsistent with its claims against Zurich on appeal. The parties conceded below that Zurich had primary coverage for the *Wallen* accident and that none of the other policies was implicated until Zurich paid its limits. Reliance's payment to its insureds is not inconsistent with its claim that Zurich's policy should have covered the entire *Wallen* settlement. If Reliance prevails on appeal as to the extent of Zurich's coverage, Zurich must make Reliance whole.

The settlement poses a more serious question of acquiescence, however, with respect to the coverage issue Reliance is pursuing against TIG. By making a nonrefundable payment of the judgment to plaintiffs, Reliance impliedly conceded its policy provided secondary coverage for the accident. On appeal, Reliance contends its policy did not cover the *Wallen* accident at all; rather, TIG's excess coverage followed Zurich's coverage. The inconsistency in Reliance's two positions is exactly the type of inconsistency that gave rise to the acquiescence doctrine.

Reliance attempts to persuade us that its payment to plaintiffs was a subrogation payment, not merely a settlement payment, and that it primarily purchased plaintiffs' right to prosecute claims against Zurich and TIG. Along the way, it relies on the doctrine of equitable subrogation.

Reliance's arguments are unsound. First, Reliance's claim that its payment was not a settlement payment is without support. The document requiring the payment is titled "Settlement Agreement." The payment of $250,000 was made "in full and final settlement" of the various claims. Plaintiffs released Reliance "from any and all liability or obligation." The payment was made for "reasonably equivalent value in settlement of a disputed claim." Finally, Reliance agreed not to enforce any judgment it might obtain against plaintiffs in the appeal and promised to indemnify plaintiffs for any judgments Zurich or TIG might obtain against plaintiffs if Reliance prevailed on appeal.

Although the agreement also recites that Reliance is subrogated to plaintiffs' rights against Zurich and TIG, Reliance also agreed to pay a portion of any proceeds it recovered to plaintiffs. On the other hand, there was no provision requiring plaintiffs to repay any

portion of the settlement amount if Reliance's appeal was success-ful. It is clear that the primary goal of the agreement was to enable Reliance to settle its claims with plaintiffs to avoid attorney fees and interest.

In addition, the cases cited by Reliance also do not support its claims. In *Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476 (10th Cir. 1991), several employees sued their employer's primary in-surance carrier and an excess carrier when neither provided a de-fense to a negligence claim. The excess carrier then filed a cross-claim against the primary carrier, seeking indemnification. Applying Wyoming law, the trial court entered substantial verdicts against both insurers. Ultimately, the trial court denied the excess carrier's claim for equitable subrogation and the carrier appealed. On appeal, the Tenth Circuit denied the excess insurer's cross-claim for equitable subrogation because of unclean hands—it had failed to investigate or defend the underlying claims. Because of its own bad faith, the court held the excess carrier was not in the position to invoke equity. 922 F.2d at 1485.

In *Ins. Co. of North America v. Medical Protective Co.*, 768 F.2d 315 (10th Cir. 1985), a physician's excess carrier, Insurance Com-pany of North America (INA), was required to pay part of a judg-ment in a medical malpractice case when the jury's verdict ex-ceeded primary coverage. INA, in turn, sued the primary insurance carrier for failing to exercise good faith to settle the case within its policy limit. The trial court held that INA was subrogated to the rights the insured had against the primary carrier for failure to settle. The Tenth Circuit affirmed. 768 F.2d at 323.

Finally, in *Reese v. AMF-Whitely*, 420 F. Supp. 985 (D. Neb. 1976), the defendant in a products liability case brought third-party claims against two others it contended had contributed to an ac-cident. The federal district court, applying Nebraska law, held that a tortfeasor may pursue a claim for equitable contribution from joint tortfeasors when one party discharges more than its propor-tionate share of the judgment. 420 F. Supp. at 987.

These cases provide little assistance to Reliance. *Reese* is simply inapplicable because, unlike Nebraska, Kansas adheres to the com-mon-law rule that there is no right of contribution among joint

tortfeasors. *KPERS v. Reimer & Koger Assocs., Inc.*, 261 Kan. 17, 35, 927 P.2d 466 (1996). Neither of the courts in *Hocker* or *Ins. Co. of North America* addressed the question of acquiescence, and only the latter applied Kansas law. In addition, the party pursuing claims in *Hocker* and *Ins. Co. of North America* was the excess carrier suing the primary carrier. This might support hearing Reliance's claims against Zurich, plaintiffs' primary insurer, but it provides no support for Reliance's claims against TIG.

Reliance's last argument regarding acquiescence is that it preserved its right to pursue an appeal in the settlement agreement. However, an agreement between the parties that the right to appeal is not waived cannot vest an appellate court with jurisdiction to determine issues where jurisdiction is otherwise lacking. *Labette Community College v. Board of Crawford County Comm'rs*, 258 Kan. 622, 626, 907 P.2d 127 (1995).

For all of the foregoing reasons, we hold that Reliance acquiesced in the judgment as to TIG but not as to Zurich. It may continue its effort to redefine the extent of the Zurich policy on appeal, but it may no longer argue that TIG's excess coverage was triggered before its own coverage came into play. Its settlement with the plaintiffs, necessarily conceding the coverage issue it wishes to continue litigating, means the game is over as to TIG.

Governing Law

In interpreting Zurich's policy, the district court applied Canadian law, finding that the rule of *lex loci contractus* should apply and that the contract was made in Alberta, Canada. Both Reliance and TIG claim this was error, but for different reasons. Reliance contends Kansas law should apply because Zurich's policy covering the California trucks was made in Kansas. TIG argues California law should apply because that was where Zurich was obligated to perform its contract—*i.e.*, pay for the loss.

There appears to be some differences between Kansas law and California law on one hand and Canadian law on the other. A choice-of-law analysis is therefore necessary. When addressing choice-of-law issues, the Kansas appellate courts follow the Restatement (First) of Conflict of Laws (1934). See *Aselco, Inc. v.*

*Hartford Ins. Group*, 28 Kan. App. 2d 839, 848, 21 P.3d 1011, *rev. denied* 272 Kan. 1417 (2001).

The Restatement (First) contains two general principles for contracts cases. The primary rule, *lex loci contractus*, calls for the application of the law of the state where the contract is made. *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 209-10, 4 P.3d 1149 (2000); Restatement (First) of Conflict of Laws, § 332 (1934). The second rule provides that the law of the place of performance determines the manner and method of performance. *Aselco*, 28 Kan. App. 2d at 848; Restatement (First) of Conflict of Laws, § 358.

Courts have struggled on occasion to determine whether the issues in a particular case are governed by *lex loci contractus* or the law of the place of performance. See *Novak v. Mutual of Omaha Ins. Co.*, 29 Kan. App. 2d 526, 28 P.3d 1033, *rev. denied* 272 Kan. 1419 (2001) (applying *lex loci contractus* when determining validity of contract provision); *Aselco*, 28 Kan. App. 2d at 848, 852 (applying performance rule on duty to defend issue and *lex loci contractus* to contract interpretation issue).

Even the Restatement itself acknowledges that the line between the two principles is not a bright one:

"[T]here is no logical line which separates questions of the obligation of the contract, which is determined by the law of the place of contracting, from questions of performance, determined by the law of the place of performance. There is, however, a practical line which is drawn in every case by the particular circumstances thereof. When the application of the law of the place of contracting would extend to the determination of the minute details of the manner, method, time and sufficiency of performance so that it would be an unreasonable regulation of acts in the place of performance, the law of the place of contracting will cease to control and the law of the place of performance will be applied. On the other hand, when the application of the law of the place of performance would extend to a regulation of the substance of the obligation to which the parties purported to bind themselves so that it would unreasonably determine the effect of an agreement made in the place of contracting, the law of the place of performance will give way to the law of the place of contracting." Restatement (First) of Conflicts of Law, § 358, Comment b (1934).

Some pre-Restatement cases seem to follow the rule that payments under a contract should be made in the currency of the country where the payment is to be made. If the currencies of the

relevant countries bear the same name but have different value, the currency of the country where the money is payable is presumed to be intended by the parties. See *Mountain Lumber Co. v. Davis*, 9 F.2d 478, 480 (S.D.N.Y. 1925), *aff'd* 11 F.2d 219 (2d Cir.), *cert. denied* 271 U.S. 674 (1926); see also *Weiss v. State Life Ins. Co.*, 4 D.L.R. 5 (Can. 1935) (recognizing presumption but finding it rebutted). These cases seem to apply the place of performance rule.

However, in our view, this case calls more for an interpretation of the original contract. The question of the meaning of the coverage limit goes to the substance of the obligation rather than the manner of performance. See *Simms v. Metropolitan Life Ins. Co.*, 9 Kan. App. 2d 640, 642-43, 685 P.2d 321 (1984) (when construing provision defining treatment coverage, law of place contract made controls); see also 4 Holmes' Appleman on Insurance 2d, Conflicts and Choice of Law § 21.5, p. 274-75 (1998). It also makes more sense that the policy limit should remain constant regardless of where a covered accident occurred, *i.e.*, where performance turned out to be required, unless the parties have been explicit in their intention that the limit be malleable. We conclude that *lex loci contractus* applies in this situation.

The issue then becomes: Where was the contract made? The district court decided this issue based on the parties' stipulations, as well as affidavits and documents, meaning this court is in as good a position as the district court was to answer this question. See *American States Ins. Co v. Farmers Alliance Mutual Ins. Co.*, 28 Kan. App. 2d 754, 756, 20 P.3d 743, *rev. denied* 271 Kan. 1035 (2001). We therefore exercise plenary review on this issue.

Several Kansas cases have concluded that " 'the law of the forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred.' " *Systems Design v. Kansas City P.O. Employees Cred. Union*, 14 Kan. App. 2d 266, 269, 788 P.2d 878 (1990) (quoting *Shutts v. Phillips Petroleum Co.*, 235 Kan. 195, 221, 679 P.2d 1159 [1984], *rev'd in part on other grounds* 472 U.S. 797 [1985]). Generally the party seeking to apply the law of a jurisdiction other than the forum has the burden to present sufficient facts to show that other

law should apply. Failure to present facts sufficient to determine where the contract is made may justify a default to forum law. See *SIG Arms Inc. v. Employers Ins. of Wausau*, 122 F. Supp. 2d 255, 258-59 (D. N.H. 2000); *Lobo Exploration Co. v. Amoco Production*, 991 P.2d 1048, 1051-52 (Okla. Civ. App. 1999), *cert. denied*, 529 U.S. 1124 (2000); *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 204-05 (Tex. 2000). Here, under a de novo standard of review, Zurich would have the burden of proving that the contract was made in Canada and that Canadian law should therefor control.

A contract is made where the last act necessary for its formation occurs. *Wilkinson*, 269 Kan. at 210. In cases involving insurance policies, our courts have repeatedly held the contract is made where the policy is delivered. See, *e.g.*, *Safeco Ins. Co. of America v. Allen*, 262 Kan. 811, 822, 941 P.2d 1365 (1997) (Missouri law controlled when policy issued in Missouri); *American States Ins. Co. v. McCann*, 17 Kan. App. 2d 820, 823-24, 845 P.2d 74, *rev. denied*, 252 Kan. 1091 (1993). In the case of group policies, the contract is made where the master policy is delivered. *Frasher v. Life Investors Ins. Co. of America*, 14 Kan. App. 2d 583, 585, 796 P.2d 1069 (1990); *Simms*, 9 Kan. App. 2d at 643-44.

In this case, the original policy apparently was issued and delivered in Canada. Although the stipulations are vague, they indicate Elgin, based in Alberta, was seeking a policy independent of its United States parent corporation. The insurance broker involved with obtaining the original policy in 1993 and the renewals through April 1996 was based in Alberta. The premiums were paid to the Alberta broker and forwarded to Zurich.

Reliance argues the contract was made in Kansas because the 1996 endorsements, which extended the coverage date and provided coverage for the California truck at issue, were delivered in Kansas. It assumes delivery occurred when the endorsements were received in Kansas, and it assumes the endorsements constituted a new or separate contract for purposes of determining where the contract was made. Neither assumption is correct.

Zurich delivered the 1996 endorsements to M&M, who, in turn, forwarded them either to Elgin or to Lockton. M&M was Elgin's

agent for purposes of obtaining the insurance. As a broker, it was acting on behalf of the insured in procuring the insurance coverage and acting on behalf of the insurer for other purposes. See *Marshel Investments, Inc. v. Cohen*, 6 Kan. App. 2d 672, 679-82, 634 P.2d 133 (1981).

The Restatement (First) of Conflicts of Law also provides some guidance. Section 318 recognizes that when an insurance policy becomes effective on delivery through an insurance company's agent, the place of contracting is where the policy is delivered to the insured. When a policy is requested through a broker acting for a client and the policy is effective on delivery, the place of contracting is where the policy is posted or delivered to the broker. Restatement (First) of Conflicts of Law § 319 (1934).

Reliance's second assumption is that receipt of the endorsements constituted the making of a contract. However, endorsements merely alter part of the general terms of an insurance policy. In this case, the endorsements contained no language as to the policy limit; they merely extended the last day of coverage and added several vehicles to the list covered by the policy. An endorsement must be read together with the policy. "The policy remains in full force and effect except as altered by the words of the endorsement." 4 Holmes' Appleman on Insurance 2d § 20.1, p. 153 (1998). The endorsements in this case made no new contract and did not alter the place of the making of the original contract for choice-of-law purposes.

## Application of Canadian Law

Reliance and TIG argue alternatively that, even if Canadian law applied, the district court misinterpreted and misapplied it. Zurich and the district court relied on a statute contained in the Alberta Insurance Act and an appellate court decision interpreting a similar Ontario statute to find that the policy limit at issue here was unambiguously stated in Canadian dollars. They also relied on course of dealing to resolve the issue.

To the extent the district court's decision was based on its interpretation of the Alberta Insurance Act, this court's standard of

review is de novo. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000).

Section 206 of the Alberta Insurance Act, R.S.A. (1980), ch. I-5 § 1 *et seq.*, provides: "Insurance money is payable in Alberta in lawful money of Canada." " 'Insurance money' " is defined as "all insurance money, benefits, surplus, profits, dividends, bonuses and annuities payable . . . under a contract of insurance." R.S.A. (1980), ch. I-5 § 2(1.1).

None of the parties cites to any published decision in Alberta or from the Canadian Supreme Court interpreting Section 206. We have also been unsuccessful in finding any Canadian authority interpreting this provision. The district court relied instead on the Canadian Supreme Court decision in *Weiss*, which interpreted a similar provision in Ontario's statutory scheme.

In *Weiss*, the defendant, an insurer based in Indianapolis, Indiana, issued two life insurance policies to a Canadian citizen. After the insured died, a dispute arose as to whether the insurance benefits were to be paid in Canadian or United States dollars. The insurer paid the widow the face value in Canadian dollars. The wife pursued her claim that the benefits should have been paid at the higher United States dollar rate, which would have yielded about $4,000 more. The Ontario Court of Appeals held that the payment of the value of the policies in Canadian dollars was required.

On appeal to the Canadian Supreme Court, three of the five justices affirmed the Ontario Court of Appeals. 4 D.L.R. at 5. In the majority opinion, Justice Dysart noted the insurer was registered in Ontario and had agents there taking applications and collecting premiums. The court emphasized that the Ontario Insurance Act stated policies issued to Ontario residents and delivered in Ontario were to be construed under Ontario law and all moneys payable " 'shall be paid at the office of the chief officer or agent in Ontario . . . in lawful money of Canada.' [Citation omitted.]" 4 D.L.R. at 13-14. The majority found the statutory provisions and the conduct of the parties in paying the premiums in Canadian dollars rebutted any presumption that the benefits were to be paid in United States dollars. 4 D.L.R. at 14.

Two justices dissented in *Weiss*. They conceded that all the premiums paid by the insured were paid in Canadian currency and noted the policies called for payment at "the Home Office of the Company." Still, they found the policy unambiguously called for payment at the value of United States dollars because, under Canadian choice-of-law rules, the law of the place of performance governed what currency was intended. 4 D.L.R. at 8. In discussing the Ontario Insurance Act, the dissenters concluded the legislature merely intended to bring foreign insurers into the country for purposes of service of process, and the statutes were not intended to alter the policy limit. 4 D.L.R. at 11-12.

*Weiss* is persuasive in some respects. It appears Alberta's and Ontario's statutes regulating insurance are structured similarly. Ontario's 1980 revised statutes have similar provisions to those in the Alberta statutes. See R.S.O. (1980), ch. I.8, §§ 127, 129, 130, and 131. Section 130 of Ontario's Insurance Act states: "Insurance money is payable in Ontario in lawful money of Canada."

But the *Weiss* decision is less than compelling for several reasons. First, the majority stated explicitly it was limiting its decision "to the circumstances and the policies in this case." 4 D.L.R. at 16. Second, *Weiss* involved individual life insurance policies issued to a Canadian insured; accordingly, the risk of loss was anticipated to arise in Canada. Finally, we have found only one other case or legal authority citing *Weiss*, a Manitoba case decided in 1945, where *Weiss* was cited in deciding whether an insurance policy was made in Manitoba or Ontario for purposes of estate taxes. We question whether *Weiss* states any broadly applicable principle, given that it was issued more than 60 years ago and has not been cited in general legal treatises in Canada since, *e.g.*, Canadian Encyclopedic Digest (Ontario 3d ed. 1998).

Moreover, the wording of the relevant statutes has changed somewhat since *Weiss* was decided in 1935. Current Alberta law provides that "[e]very contract insuring a person domiciled or resident in Alberta . . . *or the subject matter of which is property within Alberta*, shall be deemed to be made in Alberta and shall be construed accordingly." (Emphasis added.) R.S.A (1980), ch. I-5, § 202(1). In this case, the subject matter of Zurich's policy, El-

gin's vehicles, were located in Alberta, several other Canadian provinces, and the United States. The truck involved in the Wallen accident was insured specifically with the understanding that it was to be located in California.

In view of this weak authority for the contrary proposition, we conclude that the plain language of Section 206 of the Alberta Insurance Act speaks only to the form in which payments on insurance policies are to be made, not to the manner in which their value is to be determined. The statute does not regulate the type of currency that determines the amount of the payments, only the currency in which the insured receives the amount determined.

This conclusion spurs us to look to Canadian common law for assistance in determining whether the district court erred in concluding that the policy limit was stated unambiguously in Canadian dollars.

Under general Canadian legal principles, construction of an insurance contract (as with any other contract) is a two-step process. *Consolidated-Bathurst v. Mutual Boiler*, 1 S.C.R. 888, 899, 112 D.L.R.3d 49 (Can. 1979). First, Canadian courts will attempt to ascertain the intent of the parties based upon the words they have used in the contract. As part of that process, Canadian courts will apply other rules of construction to search for an interpretation, from the whole of the contract, that would appear to promote or advance the true intent of the parties. In devining the true intent of the parties, Canadian courts consider "the time of entry into the contract, that is, the commercial atmosphere in which the insurance was contracted." *Whissell Ventures Ltd. v. Royal Insurance Co. of Canada*, 74 A.C.W.S.3d 476, 496 (Lexis 159550) (Alberta QB 1997) (citing *Consolidated-Bathurst*). If this first step fails, Canadian courts go to the second step and apply the rule of *contra proferentem*, construing the language in a manner favorable to the insured. When doubt exists as to the meaning of a limiting term, the insurer is obligated to protect itself against liability to which it would be subject. Later court decisions refer to this process as the "law of reasonable expectations" doctrine. *Whissel Ventures* at 498. Canadian courts have long emphasized, however, that the *contra preferentem* doctrine " 'ought only to be applied for the purpose

of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty.' " *Whissel Ventures* at 496-97 (quoting *Cornish v. Accident Ins. Co.*, 23 Q.B. 453, 456 (C.A. 1889).

We conclude that this contract, when viewed in the "commercial atmosphere" Canadian law requires us to examine, unambiguously states the policy limit in Canadian dollars. Like the district court, we are persuaded by the fact that all parties to the original contract were Canadians, as well as the location of nearly all of the insured risks in Canada. See *Davis by Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn. App. 1987), *rev. denied* (1988) (applying Minnesota law comparable to Canadian law; "dollars," as used in insurance contract between Canadian nationals covering risks located primarily in Canada must have referenced Canadian currency). The California rental truck involved in the accident in this case was a geographic anomaly, when the risks insured by the policy are considered as a group. In addition, all premiums, until those mistakenly paid in United States dollars after the accident, were paid in Canadian currency. There is no evidence in the record that Zurich ever sought additional payments to bring the premiums in line with a United States currency interpretation, and the only documentary evidence of its understanding of which currency the policy limit was measured in—the certificates of insurance delivered to Canadian governmental agencies—reflected Canadian dollars. Further, this outcome strikes us as fair because, although Zurich re-rated the policy before the later endorsements were issued, to the extent the exchange rate between the United States and Canada was considered, it exerted downward pressure on the price.

In sum, we depart from the district court on some of its reasoning but not from its result. As the district judge observed: "Had the underlying accident occurred in Canada, it is impossible to fathom how ambiguity could even be argued. The site of an accident giving rise to a claim under an insurance contract should not control the construction of that contract." Therefore, we agree that Zurich's $ 2 million policy limit was stated in Canadian dollars.

### Conclusion

For all of the forgoing reasons, we hold: (1) Reliance's settlement with plaintiffs did not result in acquiescence to the judgment with

respect to the extent of Zurich's coverage; (2) we must apply Canadian law to interpret Zurich's policy; (3) Zurich's policy unambiguously stated the $2 million policy limit in Canadian dollars; and (4) Reliance acquiesced to the judgment against it and in favor of TIG by settling with the plaintiffs.

Affirmed.